UNIVERSAL CITY STUDIOS, INC., et al., Plaintiffs,

v.

FILM VENTURES INTERNATIONAL, INC., et al., Defendants.

No. CV82–1033–Kn.

United States District Court, C. D. California.

April 22, 1982.

William Billick, Victoria Kifferstein, Rosenfeld, Meyer & Susman, Beverly Hills, Cal., for plaintiffs.

Kenneth E. Kulzick, Lawrence W. Dam, Amy D. Hogue, William E. Stoner, Lillick, McHose & Charles, Charles S. Vogel, David R. Ginsburg, Dean Z. Ziehl, Sidley & Austin, Los Angeles, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE PRELIMINARY INJUNCTION

KENYON, District Judge.

The order to show cause re Plaintiffs' request for issuance of a preliminary injunction came on regularly for hearing before this Court on April 2, 1982. The Court having considered the motion and all papers, declarations, documents, and other evidence filed by the parties in support of and in opposition thereto, having viewed the

motion pictures "Jaws", "Jaws 2", and "Great White", and having heard argument of counsel, makes the following findings of fact and conclusions of law pursuant to its order filed April 5, 1982, and Rule 52 of the Federal Rules of Civil Procedure:

## FINDINGS OF FACT

1. This is a civil action, filed on March 1, 1982, for copyright infringement, trademark infringement, trademark dilution and unfair competition. This preliminary injunction proceeding involves Plaintiffs' claim that Defendants have infringed the copyrights in the motion pictures "Jaws" and "Jaws 2". Plaintiffs are Universal City Studios, Inc.; Universal Pictures, a division of Universal City Studios, Inc.; (hereinafter collectively referred to as "Universal"); MCA Inc. and MCA Publishing, a division of MCA Inc. Defendants are Film Ventures International, Inc.; Last Shark Limited; Societa r.1. U. T. I.; Societa Horizon Productions; and V. I. P. International, s.r.l. Only Defendants Film Ventures International, Inc. and Last Shark Limited have appeared so far in this action.

2. Universal and MCA are Delaware corporations and have their principal place of business at 100 Universal City Plaza, Universal City, California. Universal is a subsidiary of MCA. Universal, among other things, has been engaged for many years in the business of producing and distributing motion pictures.

3. Defendant Film Ventures International, Inc. ("Film Ventures") is a Georgia corporation which does business in Los Angeles, California, and is engaged in the business of distributing motion pictures.

4. Defendant Last Shark Limited is a California limited partnership. Film Ventures is the general partner of Last Shark Limited.

5. Defendants Societa r.1. U. T. I. ("UTI"), Societa Horizon Productions ("Horizon") and V. I. P. International, s.r.l. ("VIP") are corporations with a place of business in Italy.

6. Prior to January, 1974, Peter Benchley ("Benchley") created and wrote a book entitled "Jaws", which is a fictional story about a great white shark that terrorizes the inhabitants of a coastal town on the Atlantic seaboard. Benchley has secured the exclusive rights and privileges in and to the copyright of the book "Jaws" and has received from the Register of Copyrights a Certificate of Registration identified as No. A–497539. Benchley subsequently assigned to Universal and The Zanuck/Brown Company all motion picture and allied rights in the book "Jaws".

7. Universal is the owner of the copyright in a motion picture entitled "Jaws". Prior to June 20, 1975, Universal produced the motion picture "Jaws" based on the book "Jaws" written by Benchley. Universal has received from the Register of Copyrights a Certificate of Registration identified as No. LP–4455.

8. Since approximately June 20, 1975, Universal has exhibited the motion picture "Jaws" throughout the United States and the world to millions of members of the public. Defendants have had access to Benchley's book "Jaws" and Universal's motion picture "Jaws".

9. Defendants UTI and Horizon produced on or about 1980 a motion picture about a great white shark that terrorizes the inhabitants of a coastal town on the Atlantic seaboard. UTI and Horizon promoted that motion picture in the United States, and it has been distributed in some foreign countries, using the title "The Last Jaws". That motion picture has been distributed in the United States using the title "Great White" and will be referred to hereinafter as "Great White". Defendants had no permission or consent from Universal or Benchley to produce or distribute "Great White".

10. Prior to October 15, 1981, defendant VIP possessed all theatrical and non-theatrical distribution rights for "Great White" for the United States and Canada (English speaking). Pursuant to an agreement dated October 15, 1981, Last Shark Limited acquired all of those rights from VIP. Last

Shark Limited subsequently assigned to Film Ventures all theatrical and non-theatrical distribution rights for "Great White" for the United States and Canada (English speaking).

11. The general idea of the motion picture "Jaws" and "Great White" is the same, i.e., the motion picture depiction of a terror fish attacking a coastal town on the Atlantic seaboard. For the purposes of this motion for a preliminary injunction, Defendants have stipulated that the general idea of both "Jaws" and "Great White" is the same, and, thus, the first prong of the bifurcated substantial similarity test set forth in *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp., et al.,* 562 F.2d 1157, 1164 (9th Cir. 1977) has been satisfied.

12. The expression of the general idea in "Great White" and the motion picture "Jaws" is substantially similar under the intrinsic "ordinary observer" test of *Krofft,* 562 F.2d at 1164. For example, and without limitation, the basic story points, the major characters, the sequence of· incident, and the development and interplay of the major characters and story points of "Great White" are substantially similar to these elements in "Jaws".

13. Substantial similarity of the basic story points is found in the following comparisons: ·

a. The local politician, a gubernatorial candidate in "Great White" and the mayor in "Jaws", both of whom play down the news of the shark in the interest of local tourism.

b. In "Great White" the action revolves primarily around a salty, English-accented skipper and a local shark expert who go out in a boat to hunt the shark; in "Jaws" the action similarly revolves primarily around a salty English-accented skipper, a shark expert, and the local police chief who go out in a boat to hunt the shark.

c. In the finale of "Great White" the skipper is eaten by the shark, and then the shark expert kills the shark by detonating dynamite which the shark has swallowed.

In the finale of "Jaws" the skipper is eaten by the shark, and then the police chief kills the shark by exploding a canister of compressed air which the shark has swallowed.

14. Furthermore, all the major characters in "Great White" have substantially similar counterparts in "Jaws":

a. The shark in both films becomes a principal character in its own right. The two sharks are maniacal and demonic, attacking people and boats for reasons beyond satisfying hunger. In addition, when hunted, both sharks attack the hunters rather than flee. The presence of the sharks in the waters of the coastal resorts in each film is unusual.

b. The salty skippers, both of whom have heavy English-type accents and are experienced shark hunters, are substantially similar. The skipper in the two works accompanies the expedition in search of the shark and is killed in the finale.

c. The politicians in both films are also substantially similar; they are concerned about the effect that the news would have on tourism. Specifically, in "Great White" the gubernatorial candidate is concerned about the windsurfing regatta and his political campaign; in "Jaws" the mayor is concerned about the Fourth of July weekend. Moreover, in "Great White", after the shark expert's child is injured by the shark, the politician apologizes to the father in the hospital and as an act of contrition personally hunts for the shark. In "Jaws" after the police chief's child has gone into a state of shock because of the shark, the politician apologizes to the father in the hospital and as an act of contrition signs a contract hiring the salty skipper to hunt the shark.

d. Finally, the local shark expert in "Great White", Peter Benton (James Franciscus) is a combination of two characters in "Jaws": the shark expert (Richard Dreyfuss) and the local police chief (Roy Scheider). As the shark expert in "Jaws", Richard Dreyfuss tries to warn the town of the dangers of the shark; in "Great White", the shark expert does the same thing. In "Jaws", the local police chief has a blond wife and a child injured by the shark; in

"Great White", James Franciscus has a blond wife and a child injured by the shark.

15. There is also substantial similarity between the development and interplay of the major characters and story points. The following non-inclusive list of comparisons of major incidents and the sequence of action indicates substantial similarity in the expression of the ideas of the two works at issue:

a. The opening scene in both films depicts teenagers playing on the beach. In "Great White" there are many underwater shots of a windsurfer, repeated musical bass tones to indicate the approach of the shark and to build tension, and the windsurfer becomes the first victim of the shark. In "Jaws" there are many underwater shots of a swimmer, repeated bass tones to indicate the approach of the shark and to build tension, and the swimmer becomes the first victim.

b. In "Great White" the action then shifts to the shark expert and his wife at home. After their daughter returns home, the expert goes out to search for the missing windsurfer and finds part of the surfboard. He examines the surfboard and determines that a shark is responsible. In "Jaws" the police chief and his wife are at home. After their son returns home, the police chief receives a phone call which informs him that the swimmer is missing. The police chief finds part of the swimmer's body (which was initially discovered by his assistant) and concludes that a shark is responsible.

c. In "Great White" there is a boat scene in which, to the accompaniment of bass tones, the shark approaches the boat, bumps it, and causes a girl to fall into the water. The girl is rescued before the shark attacks. In "Jaws" there is a similar boat scene in which, again to the sound of bass tones, the shark approaches the boat, bumps it, and causes a boy to fall into the water. The boy is also rescued before the shark attacks.

d. In "Great White" the empty boat of a local fisherman is found floating in the water. After examining the arm of the fisherman discovered in the hull, the expert tries to warn the politician about the dangers of the shark. In "Jaws" the police chief and the scientist find the empty boat of a local fisherman floating in the water. After examining the body of the dead fisherman and a shark's tooth found in the hull, the two men try to warn the politician about the dangers of the shark.

e. The scare technique of a false alarm is present in both films. In "Great White" a broken surfboard, which looks like the fin of a shark, floats through the water. In "Jaws" a bathing cap, which looks like the head of a shark, floats through the water.

f. Both politicians agree to take security measures. In "Great White" several boats with armed spotters are placed around the bay and underwater netting is installed. The gubernatorial candidate refuses to cancel the windsurfing regatta. In "Jaws" several boats with armed spotters are placed around the harbor. The Fourth of July festivities are not cancelled by the mayor.

g. In both works, the shark attacks a dinghy. The dinghy is capsized, and the shark's consumption of the occupant is shown.

h. In "Great White" a local newsman and his cameraman, in order to obtain publicity, decide to lower raw meat off the pier as shark bait. The shark grabs the bait, breaking off part of the pier. People fall off the pier; some manage to reach shore as the shark attacks. In "Jaws" two bounty-hunters, seeking the monetary award, decide to lower raw meat off the pier as shark bait. The shark grabs the bait and breaks off part of the pier. One of the men falls off the pier and into the water, but manages to swim back to shore before the shark attacks.

i. The apologies and acts of contrition by the politicians in both films, which have already been described, also indicate substantial similarity in the major incidents and sequence of events in the two works.

j. The final scene in both movies involving the swallowing of the skipper and the

explosion of the shark (described more fully above) is also evidence of similarity of the expression of the idea through major incidents and sequence of events.

16. There is significant likelihood that a jury, applying the intrinsic ordinary observer test, would find the protectable expression of ideas in the motion picture "Jaws" and "Great White" substantially similar.

17. There is a probability and a likelihood that Universal will succeed at trial on the merits of its copyright infringement claim regarding "Great White" and the motion picture "Jaws".

18. Pursuant to licenses from Film Ventures, approximately 300 theaters in the United States began exhibiting "Great White" on March 5, 1982. "Great White" currently is in exhibition throughout the United States.

19. In the time period between the denial of the temporary restraining order on March 5, 1982, and the April 5, 1982 order granting the preliminary injunction, Defendants entered additional licensing agreements with exhibitors to play "Great White".

20. In addition to producing the motion picture "Jaws", Universal produced and distributed in 1978 a sequel to "Jaws" entitled "Jaws 2". Universal also intends to release a wholly new motion picture entitled "Jaws 3" during the summer of 1983.

21. Universal has entered into licenses of the commercial and pay television rights to "Jaws" and "Jaws 2".

22. The properties "Jaws" and "Jaws 2" have great value. Universal has derived substantial revenue in the past from these properties, is continuing to receive substantial revenues now, and expects to continue receiving substantial revenues in the future from these properties.

23. Defendants have moved for reconsideration and/or clarification of the April 5, 1982 order granting the preliminary injunction. The hearing was held on April 20, 1982. The Court's ruling denying this motion shall be issued at the same time as these findings of fact and conclusions of law.

## CONCLUSIONS OF LAW

The Court has jurisdiction over the subject matter of this civil action pursuant to Section 1121 of Title 15 and Section 1338 of Title 28 of the United States Code. Defendants Film Ventures International and The Last Shark Limited are before the Court, and the Court has personal jurisdiction over these two Defendants.

2. The standard for granting a preliminary injunction in an action for copyright is well-settled in the Ninth Circuit. In order to prevail, the plaintiff must demonstrate: (1) irreparable injury; and (2) likelihood of success on the merits. *Walt Disney Productions v. Air Pirates*, 345 F.Supp. 108, 110 (N.D.Cal.1972), *aff'd* 581 F.2d 751 (9th Cir. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979).

3. With respect to the first requirement of irreparable injury, notwithstanding Defendants' contention to the contrary, it is also well-settled that upon a showing of a prima facie case of copyright infringement, irreparable injury will be presumed, and a preliminary injunction will issue. *Warner Bros., Inc. v. American Broadcasting Companies*, 523 F.Supp. 611, 615 (S.D.N.Y.1981); *Thought Factory, Inc. v. Idea Factory, Inc.*, 203 U.S.P.Q. 331, 335 (C.D.Cal.1978); *Air Pirates*, 345 F.Supp. at 110. Moreover, notwithstanding the presumption of irreparable injury, Plaintiffs have established that they would suffer irreparable injury for which monetary relief would be inadequate: the commercial exploitation of "Jaws" and "Jaws 2" through theatrical rerelease, television, and video cassettes will be diminished as will the potential economic value of "Jaws 3". Supplemental Declaration of John G. Nuanes, dated March 3, 1982.

4. Turning to the likelihood of Plaintiffs' success on the merits, this court's analysis is governed by the leading Ninth Circuit case on copyright infringement, *Sid & Marty Krofft Television Productions, Inc.*

*v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977). To establish infringement, the plaintiff must prove both ownership of the copyright and "copying" by the defendant. "Copying", in turn, is composed of two parts: (1) circumstantial evidence of the defendant's access to the copyrighted work; and (2) substantial similarity between the copyrighted work and the defendant's work. *Id.* at 1162. In the present case, it should be noted that there is no issue with respect to either Plaintiffs' ownership or Defendants' access. Thus, the only question which must be resolved is whether there is substantial similarity between Plaintiffs' copyrighted work and Defendants' movie, "Great White", or, more specifically, whether there is a likelihood that Plaintiffs will succeed on the merits at trial on the issue of substantial similarity.

5. The *Krofft* court established yet another two-part test to determine whether there is substantial similarity between the plaintiff's and the defendant's works. The first inquiry is whether there is substantial similarity between the general ideas of the two works. If the first step is satisfied, then the second inquiry is whether there is substantial similarity between the expressions of the ideas as well. *Id.* at 1164.

6. Before addressing the question of substantial similarity, the Court observes that, for the purposes of its analysis, it has considered only the relationship between Plaintiffs' copyrighted work, "Jaws", and Defendants' work, "Great White". In reaching its decision, it has not relied upon a comparison between "Jaws 2" and "Great White" or between Defendants' work and "Jaws" and "Jaws 2" in conjunction.

7. Pursuant to the bifurcated test for substantial similarity set forth in *Krofft,* the first inquiry regarding the general ideas contained in the two works is to be resolved by an "extrinsic test". "It is extrinsic because it depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." These criteria include "the type of artwork involved, the materials used, the subject matter, and the setting for the subject."

Moreover, "analytic dissection and expert testimony are appropriate" when the extrinsic test is employed. *Id.* at 1164. On the other hand, the second inquiry concerning the expression of the general ideas is to be determined pursuant to an intrinsic test, one which depends on the response of the ordinary reasonable person. "It is intrinsic because it does not depend on the type of external criteria and analysis which marks the extrinsic test." *Id.* And, because it is intrinsic rather than extrinsic, analytic dissection and expert testimony are not appropriate. *Id.*

8. Although the Ninth Circuit has indicated the tests which are to be employed when the question of substantial similarity is presented, these tests are predicated upon the initial determination of what is a general idea and what is the expression of such an idea. This determination, however, is not always easily made, especially when complex works such as motion pictures are at issue. *Twentieth Century-Fox v. MCA*, 6 Med.L.Rptr. 2016, 2018 (C.D.Cal.1980).

9. At the hearing on April 2, 1982, the parties stipulated that the general idea of both "Jaws" and "Great White", for the purposes of the substantial similarity test, is the same. The Court concurs with this stipulation and adopts the agreed to general idea, a terror fish attacking a coastal town on the Atlantic seaboard, for the purposes of its analysis. Therefore, it is the second inquiry of the substantial similarity test, the expression of the general idea, which remains at issue.

10. As noted above, the question of substantial similarity of expression of the general idea is to be resolved pursuant to an intrinsic test. The Court recognizes that "the intrinsic test for expression is uniquely suited for determination by the trier of fact," *Krofft,* 562 F.2d at 1166, and that a jury is the ultimate trier of fact in the present case. Nonetheless, it is proper for the Court at this juncture to consider the question of similarity of expression. At this hearing the question before the Court is whether it is likely that Plaintiffs will prevail on the merits or, in other words,

persuade the jury that there is substantial similarity of expression and that, therefore, Defendants have infringed their work.

11. Plaintiffs contend that there is sufficient similarity of expression to mandate a finding of infringement because there is substantial similarity between the basic story points, the major characters, the sequence of incident, and the development and interplay of the major characters and story points of their copyrighted works, "Jaws" and "Jaws 2", and "Great White". Plaintiffs' Reply Memorandum of Points and Authorities in Support of Its Motion for a Preliminary Injunction, filed March 26, 1982, pp. 14–24. On the other hand, Defendants argue that neither the basic idea nor the scenes a faire present in Plaintiffs' motion pictures is protected and that upon elimination of these elements from "Jaws" and "Jaws 2", "virtually no similarity remains" with respect to "Great White". Defendants' Points and Authorities to Show Cause Why a Preliminary Injunction Should Not Issue, filed March 19, 1982, p. 12. In essence, most, if not all, of that which Plaintiffs present as evidence of substantial similarity of expression in support of their contention of copying, Defendants characterize as unprotected elements which do not constitute expression of ideas and are not even subject to review for infringement.

12. The Court rejects Defendants' overly expansive view of that which falls within the unprotected sphere of general ideas and scenes a faire and, instead, adopts Plaintiffs' characterization of that which constitutes the expression of ideas. Pursuant to this framing of the idea/expression dichotomy, a preliminary injunction should issue because there is a significant likelihood that a jury, applying the intrinsic ordinary observer test, would find the expression of ideas in "Jaws" and "Great White" substantially similar. That is the Court's opinion after viewing the films at issue; "Jaws 2" was also shown to the Court, but it plays no role in this analysis. The similarity in the basic story lines, the major characters, the sequence of events, and the interplay and development of the characters and the plot is substantial. These similarities are set forth more fully in Findings of Fact Numbers 12–15. And while the two films are not identical, "(d)uplication or near identity is not necessary to establish infringement. (Citations omitted.)" *Krofft*, 562 F.2d at 1167. To put it simply, Defendants have captured the "total concept and feel" of Plaintiffs' motion picture, "Jaws". *Id.*

13. In addition to the similarities of expressions discussed above, the Court notes that Defendants' work, "Great White", was originally titled "The Last Jaws" and was to be released in the United States so named. It has also observed that a major character in "Great White", the writer, is named Peter Benton, and that Peter Benchley is the author of "Jaws". While the Court has not relied on the use of such names to conclude that the expression of the ideas of the two motion pictures is substantially similar, it is indicative of the attitude of the creators of "Great White", who are not the defendants presently before the Court. In light of the great similarity in expression, it would seem fair to conclude that the creators of "Great White" wished to be as closely connected with Plaintiffs' motion picture, "Jaws", as possible.

14. Finally, the Court notes that Defendants have moved for reconsideration and/or clarification of the April 5 order granting the preliminary injunction in the interim between the issuance of that order and the formal order in conjunction with these findings of fact and conclusions of law. Extensive briefing was submitted, and oral argument was heard on April 20, 1982. The Court, for the reasons set forth in its Order Re Defendants' Motion for Reconsideration and/or Clarification, which shall be issued at the same time as these findings, denies the motion.

15. In conclusion, a preliminary injunction shall be granted because the three bifurcated tests for infringement set forth by the Ninth Circuit in *Krofft* have been met. The finding of substantial similarity of expression of the general idea of "Jaws" and

"Great White", coupled with the stipulation that the general idea of both works is the same, satisfies the two prongs of the substantial similarity test. In turn, the requirement of copying is fulfilled: there is no issue with respect to Defendants' access to Plaintiffs' work and substantial similarity has been shown. Finally, the presence of copying in addition to Plaintiffs' ownership of the copyright establishes infringement. Thus, the issuance of a preliminary injunction is appropriate because there is a probable likelihood of success on the merits, and irreparable injury, if not presumed in a copyright action such as this, has been demonstrated.

16. Any finding of fact that may be adopted as a conclusion of law, or any conclusion of law that may be adopted as a finding of fact, is hereby adopted as such.

17. Universal is entitled to a preliminary injunction during the pendency of this action restraining and enjoining Defendants Film Ventures and Last Shark Limited from exhibiting, distributing, exploiting, publicly performing, marketing, advertising, selling, promoting, licensing, or causing or authorizing the sale, distribution, exhibition, public performance, exploitation, licensing, marketing, advertising, or promotion of "Great White", or any version thereof, in any form in the United States. 17 U.S.C. § 502(a).

18. Defendants Film Ventures and Last Shark Limited should be required forthwith to deliver to the Clerk of this Court to be impounded during the pendency of this action all prints and negatives of "Great White", or any version thereof. 17 U.S.C. § 503(a).