Barbara **CHASE–RIBOUD**, Plaintiff,

v.

**DREAMWORKS, INC., et al., Defendants.**

**No. CV 97–7619 ABC (Jgx).**

United States District Court,
C.D. California.

Dec. 8, 1997.

Pierce O'Donnell, John Shaeffer, Lee Robyn Seltman, O'Donnell & Shaeffer, Los Angeles, CA, for Plaintiff.

Bertram Fields, Robert S. Chapman, Greenberg Glusker Fields Claman & Machtinger, Los Angeles, CA, for Defendants.

### ORDER RE: PLAINTIFF CHASE–RI-BOUD'S MOTION FOR PRELIMI-NARY INJUNCTION

COLLINS, District Judge.

Plaintiff BARABARA CHASE–RIBOUD's Motion for Preliminary Injunction came on regularly for hearing before this Court on December 8, 1997. The Court has reviewed the materials submitted by the parties, argument of counsel, and the case file relating to

Plaintiff's Motion for a Preliminary Injunction. Because Plaintiff has failed to meet her burden, the Court DENIES Plaintiff's motion.

### I. Procedural Background[1]

For three years Plaintiff researched the story of the Amistad. Chase–Riboud Decl. ¶¶ 9–13. In Plaintiff's rendition of the Amistad story, she selectively used the historical record. Chase–Riboud Decl. ¶¶ 15–16. Where gaps in the historical record appeared, she filled them with fictional scenes and characters. Chase–Riboud Decl. ¶¶ 17–22. Plaintiff published her historical novel *Echo of Lions* in 1989. Since then, Plaintiff's book has sold over 500,000 copies and has been translated into five languages. Chase–Riboud Decl. ¶ 28.

In February 1993, Plaintiff granted Punch Productions, Inc. a 12–month option for the right to license the theatrical motion picture rights of *Echo of Lions*. Punch renewed that option for two six-month periods and an additional one-month period. Chase–Riboud Decl. ¶¶ 30. David Franzoni, the credited screenwriter for "Amistad," participated in pitching the "Echo of Lions Project" to major studios, including Warner Brothers. Pettis Decl. ¶¶ 9–10 and Exh. B. After Punch abandoned the project, Defendants retained Franzoni as a writer. Chase–Riboud Decl., Exh. V.

In 1996, Defendants announced that Steven Spielberg would direct "Amistad." Chase–Riboud Decl. ¶ 31. Plaintiff then contacted the Defendants to remind them that she had previously submitted her book to Amblin Entertainment, Spielberg's production company. Chase–Riboud Decl. ¶ 32.

On October 16, 1997, Chase–Riboud filed a Complaint naming, *inter alia*, DREAMWORKS, INC., DREAMWORKS FILMS LLC, DREAMWORKS DISTRIBUTION LLC, AND DREAMWORKS LLC (collectively "Defendants"). Plaintiff's complaint alleges that the Defendants impermissibly infringed on her copyrighted historical novel *Echo of Lions* when they made the motion picture "Amistad."

Plaintiff filed a Motion for a Preliminary Injunction on November 17, 1997. Defendants filed their Opposition on November 26, 1997. On December 3, 1997, Plaintiff filed her Reply.

### II. Discussion

#### A. Preliminary Injunction Standard

Traditionally, a court may issue a preliminary injunction if it determines: (1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and, depending on the nature of the case, (4) the public interest favors granting relief. *International Jensen v. Metrosound U.S.A.*, 4 F.3d 819, 822 (9th Cir.1993).

■ Under the "alternative standard," a party may obtain a preliminary injunction, by demonstrating *either*: (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *Id.* "The alternative standards are not separate tests but the outer reaches of a single continuum." *Id.* (quotation omitted). Essentially, the trial court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Schwarzer & Tashima, *Federal Civil Procedure Before Trial*, at 13:39.

#### B. Copyright Infringement Standard

■ To establish copyright infringement, Plaintiff must prove (1) that Plaintiff owned the copyrights, and (2) that Defendants copied Plaintiff's copyrighted work. *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir.1996). "Copying" is composed of two parts: "(1) circumstantial evidence of the defendant's access to the copyrighted work; and (2) substantial similarity between the copyrighted work and the defendant's work." *Universal City Studios, Inc. v. Film Ventures Int'l, Inc.*, 543 F.Supp. 1134, 1140 (C.D.Cal.1982); *see also Direct Marketing of Virginia v. E. Mishan & Sons, Inc.*, 753 F.Supp. 100, 104 (S.D.N.Y.1990) ("Where direct evidence of

---

1. Because the parties are intimately familiar with the facts of this case and the story of the slave ship Amistad, they need not be restated at great length here.

copying is unavailable, plaintiff in a copyright infringement action can prove copying indirectly by proving access and substantial similarity.") (citing 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* 13.01[B] (1990)).[2]

■ In this case, the parties do not dispute that Plaintiff has ownership of a copyrighted work—the historical fiction *Echo of Lions*. *See* Chase–Riboud Decl. ¶ 3 and Exh. E. The parties also do not seriously dispute that Defendants had access to Plaintiff's work. *See* Defs.' Opp. at 36 ("Clearly, defendants had the opportunity to view *Echo of Lions* .... It was submitted to Amblin and was optioned by Punch, who did discuss an Amistad project with Franzoni."); *see also* Footnote 1, *supra.* "Access is proven when the plaintiff shows that the defendant had an opportunity to view or to copy plaintiff's work." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1172 (9th Cir.1977). Defendants' "admission that they had access to [Plaintiff's work] is a factor to be considered in favor of [Plaintiff]." *Shaw,* 919 F.2d at 1362. Thus, the determinative factor in this case is whether there is "substantial similarity" between *Echo of Lions* and Defendants' "Amistad" or, "more specifically, whether there is a likelihood that Plaintiff[ ] will succeed on the merits at trial on the issue of substantial

similarity." *Universal City,* 543 F.Supp. at 1140.

■ In *Krofft,* the Ninth Circuit established a two-part test to determine whether substantial similarity exists between the plaintiff's and defendants' works. The first inquiry is the "extrinsic" test and asks if there is similarity of ideas. *See Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1164 (9th Cir.1977); *see also Universal City,* 543 F.Supp. at 1140 ("The first inquiry is whether there is substantial similarity between the general ideas of the two works."). "Substantial similarity" refers to similarity of expression, not merely similarity of ideas or concepts. *See* 17 U.S.C. § 102(b). "[S]ubstantial similarity in the expression of an idea may appear from the mood evoked by the work as a whole." *See v. Durang,* 711 F.2d 141, 144 (9th Cir. 1983). The objective extrinsic test is based on specific expressive elements, and focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters and sequence of events" in the two works. *Kouf v. Walt Disney Pictures Television,* 16 F.3d 1042, 1045 (9th Cir.1994). The first inquiry allows "analytic dissection." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1398 (9th Cir. 1997).[3]

**2.** As an initial matter, Plaintiff contends that she has *conclusive proof* that Defendants copied her book. Plf's. Mot. at 24. Plaintiff contends that because she has presented proof of actual copying, " 'that is the end of the case.' " Plf's. Reply at 13 (quoting *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 445 (4th Cir.1986)). Plaintiff relies on specific examples to support her claim, including the following:

(1) David Franzoni, the credited screenwriter, received a copy of *Echo of Lions;*
(2) Franzoni worked with Punch Productions for six to eight months as a writer on the "Echo of Lions Project" while Punch was licensed to use Plaintiff's book and helped pitch the project to Warner Brothers;
(3) Franzoni's screenplay contains historical "errors" contained in "Echo of Lions," including:
(i) a letter from Queen Victoria to President Van Buren; (ii) the destruction of a slave colony concurrent with the United States Supreme Court decision setting the Africans free; (iii) the portrayal of the interpreter, James Covey, as a person that speaks near-

perfect English; and (iv) the number of Cinque's children;
(4) "Amistad" and *Echo of Lions* contain the same fictional character—a wealthy, erudite, Black man involved with the printing of abolitionist literature; and
(5) an early shooting script was entitled "The Other Lion";
Plf's. Mot. at 24–25; Pl's. Reply at 13–14.
Plaintiff's evidence fails to conclusively prove actual copying. *See Shaw v. Lindheim,* 919 F.2d 1353, 1356 (9th Cir.1990) ("[I]n most cases, direct evidence of copying is not available."). Defendants have steadfastly denied *any* copying, much less direct copying. Defs.' Opp. at 7, 13. Moreover, Plaintiff has merely presented the type of circumstantial evidence of copying that arises from "access" to the allegedly infringed work. Thus, the Court finds that Plaintiff has merely presented circumstantial evidence of copying and not conclusive-proof of actual copying.

**3.** " 'Analytic dissection' focuses on isolated elements of each work to the exclusion of the other elements, combination of elements, and expressions therein." *Dr. Seuss,* 109 F.3d at 1398.

The second inquiry is the "intrinsic" test and asks if an "ordinary reasonable person" would perceive a substantial taking of protected expression. *Dr. Seuss,* 109 F.3d at 1397 (citing *Krofft*). The "intrinsic" test looks for substantial similarity in the "total concept and feel" of two works. *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir. 1984).[4]

The Ninth Circuit has modified the "*Krofft*" test. *See, Apple Computer Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1442–43 (9th Cir.1994). The Ninth Circuit has stated:

> As it has evolved, however, the extrinsic test now objectively considers whether there are substantial similarities in both ideas and expression, whereas the intrinsic test continues to measure expression subjectively.... Because only those elements of a work that are protectable ... can be compared when it comes to the ultimate question of illicit copying, we use analytic dissection to determine the scope of copyright protection before works are considered 'as a whole.'

*Id.* (citation omitted). "Because the criteria incorporated into the extrinsic test encompass all objective manifestations of creativity, the two tests are more sensibly described as objective and subjective analyses of expression, having strayed from *Krofft*'s division between expression and ideas." *Shaw v. Lindheim,* 919 F.2d 1353, 1357 (9th Cir. 1990).

"[T]he party claiming infringement may place 'no reliance upon any similarity in expression resulting from' unprotectable elements." *Apple Computer Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1446 (9th Cir.1994). "[C]opyright protection does not extend to historical or contemporary facts, material traceable to common sources or in the public domains, and *scenes a faire.*" *Walker v. Time Life Films, Inc.,* 615 F.Supp. 430, 435 (S.D.N.Y.1985). "Where common sources exist for the alleged similarities, or the material that is similar is otherwise not original with the plaintiff, there is no infringement." *Al-*

*exander v. Haley,* 460 F.Supp. 40, 45 (S.D.N.Y.1978).

Copyright protection does not extend to factual aspects of a work. 17 U.S.C. § 102; *see Alexander,* 460 F.Supp. at 44–45 (finding no infringement where "[m]any of the claimed similarities are based on matters of historical or contemporary fact"). "No claim of copyright protection can arise from the fact that plaintiff has written about ... historical and factual items, even if we were to assume that [the alleged infringer] was alerted to the facts in question by reading [the infringed work]." *Alexander,* 460 F.Supp. at 45. "Historical facts and theories may be copied, as long as the defendant does not bodily appropriate the expression of the plaintiff." *Narell v. Freeman,* 872 F.2d 907, 911–12 (9th Cir.1989) (citation omitted). "[T]he scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain." *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 974 (2d Cir.1980).

## C. Analysis
### Probable Success on the Merits & Substantial Similarity

Plaintiff contends that several substantial similarities exist. Plaintiff points to the following:

1. *Theodore Joadson and Henry Braithwaite.* Plaintiff contends that these characters serve the same plot function in both works. Namely, these characters link the Black and White communities and link Black America and Africa. Chase–Riboud Decl. ¶¶ 17–18.

2. *Cinque.* Plaintiff contends that unlike the historical factual record or any other treatment of these story, in both "Amistad" and *Echo of Lions* Cinque has a voice, understands what is happening to him, and contributes to his defense. Plf's. Mot. at 9. Moreover, Plaintiff contends that in both works Cinque remains true to his African

---

4. While the intrinsic test for expression is uniquely suitable for resolution by the trier of fact, the Court may properly consider the intrinsic test at the preliminary injunction stage. The question before the Court is "whether it is likely that Plaintiff[ ] will prevail on the merits or, in other words, persuade the jury that there is substantial similarity of expression and that, therefore, Defendants have infringed [her] work." *Universal City,* 543 F.Supp. at 1140–41.

roots and calls upon his ancestors for help in his legal battle. Chase–Riboud Decl. ¶ 38. Plaintiff notes that the historical record reflects that Cinque did not comprehend the judicial proceedings and did not materially assist in his defense. Chase–Riboud Decl. ¶¶ 19–20.

3. *The Relationship Between Adams and Cinque.* Plaintiff contends that both works contain a meeting of these two men in which both men express their respect for each other. Plaintiff asserts that in both works the men have a long conversation during which Cinque gives Adams a theme for his oral argument. Chase–Riboud Decl. ¶¶ 21–22, 39.

4. *First Civil Rights Trial.*

5. *Title.* The book is entitled *Echo of Lions* while an early version of the screenplay was entitled "The Other Lion."

6. *The destruction of a slave colony concurrent with the United States Supreme Court decision.*

7. *Covey speaks near-perfect English.*

8. *Cinque has one child.*

9. *Ending Tied to the Civil War.*[5]

■ Each of these potential substantial similarities will be addressed in turn.[6]

---

**5.** Plaintiff included other examples in support of her claim that substantial similarity exists between the two works, including; (1) a letter from Queen Victoria to President Van Buren; (2) Cinque crying out from Africa to a civil war battlefield; and (3) Cinque and his brother-in-law working in rice fields in Africa. Chase–Riboud Decl. ¶ 42. Because Defendants have removed these scenes from the final movie, the Court does not consider them here. *See Walker,* 615 F.Supp. at 436 ("[T]he court need only consider the final version of the film as presented to the viewing public.").

**6.** Because the Plaintiff focused on the nine similarities listed above, the Court limits its discussion to these factors rather than engaging in a full analytic dissection under the extrinsic test. The Court notes, however, that because both works are based on historical events, the plot (except for the love story in *Echo of Lions*), settings, and general sequence of events in the two works are inherently similar. The Plaintiff does not contend that the dialogue is similar, and the Court has found no similarity of dialogue in its analysis. Thus, the Plaintiff has not shown a probability of success on these factors. The

*Theodore Joadson and Henry Braithwaite*

Defendants first contend that these characters constitute *scenes à faire. See* Suber Decl. ¶ 35.[7] This contention appears to be without merit.

■ *Scenes à faire* and factual material must be filtered out of any analysis of substantial similarity. *See Apple Computer Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1444 (9th Cir.1994). *Scenes à faire* "are incidents, characters or setting which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Alexander,* 460 F.Supp. at 45.

Plaintiff notes that despite the "hundreds of black abolitionists in New England at that time," Clifton H. Johnson Decl. ¶ 11, none had a role in the Amistad matter comparable to that portrayed by the Joadson or Braithwaite characters. Plaintiff also notes that her work was the first modern retelling of the Amistad story to have such a character. Shaeffer Supp. Decl., ¶¶ 4–6. Given such circumstances, it appears to the Court that the Joadson/Braithwaite characters do not constitute *scenes à faire* . The Court cannot conclude that those characters were "indispensable, or at least standard, in the treatment of a given topic." *Alexander,* 460 F.Supp. at 45.

---

theme is discussed in Plaintiff's argument regarding the First Civil Rights Trial.

Although the historical events necessarily have a similar pace, the Court notes that the mood and pace of *Echo of Lions* are influenced by the importance of its fictional plot—the love story between Covey and Vivian Braithwaite. There is no love story in "Amistad." As a result, *Echo of Lions,* as a whole, has a different flow and pace, with accompanying mood changes caused by the ebb and flow of the poignant love story. "Amistad's" mood and pace are dictated solely by the historical events surrounding Cinque and the other Africans. Consequently, the Court finds that the Plaintiff has not shown a probability of success of prevailing on these two factors in the extrinsic test.

**7.** The Court DENIES Plaintiff's Motion to Strike Professor Suber's Declaration. The Court also OVERRULES Plaintiff's Evidentiary objections to the Declarations of Professor Howard Suber and Clifton H. Johnson. The Court also OVERRULES Defendants' Evidentiary Objections to the Declarations of Pierce O'Donnell, Nell Irvin Painter, and Gary B. Nash.

Defendants next highlight the differences between these characters. They note that Plaintiff's Braithwaite is a wealthy land owner and print shop operator whose prosperous land-owning family has been in America for over 200 years. *See* Professor Howard Suber Decl. ¶ 50. Joadson, in contrast, is a runaway slave with no background of family wealth who apparently assists the abolitionist Tappan with publication of an anti-slavery newspaper. Suber Decl. ¶ 51. Defendants also note that Joadson, unlike Braithwaite, plays a critical role in assisting the Africans' defense by interviewing prospective lawyers, searching for evidence, and urging John Quincy Adams to take the case.

Plaintiff counters by contending that these two characters have "the same characteristics" and serve the same plot function in both works. Chase–Riboud Decl. ¶ 36. Namely, Plaintiff contends that in both works these characters: (1) link the Black and White communities and link Black America and Africa, Chase–Riboud Decl. ¶¶ 17–18; (2) provide a contemporary Black voice to the Amistad story, *id.;* (3) were both members of the abolitionist cause, Shaeffer Decl., Exh. 108, *Echo of Lions,* at 148, 150, 346; and (4) printed abolitionist pamphlets. Henderson Decl., Exh. B, at 98; Shaeffer Decl., Exh. 108, *Echo of Lions,* at 150.

In *Warner Bros. Pictures, Inc. v. Columbia Broadcasting Sys., Inc.,* 216 F.2d 945, 950 (9th Cir.1954), the Ninth Circuit stated that characters ordinarily may not be copyrighted. Nevertheless, cases subsequent to *Warner Bros.* "have allowed copyright protection for characters who are *especially distinctive." Olson v. National Broadcasting Co.,* 855 F.2d 1446, 1452 (9th Cir .1988) (emphasis added). For example, copyright protection exists for cartoon characters because they have " 'physical as well as conceptual qualities' " that are " 'more likely to contain some unique elements of expression.' " *Id.* (quoting *Walt Disney Prods. v. Air Pirates,* 581 F.2d 751, 755 (9th Cir.1978)); *see also Warner Bros., Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 240–45 (2d Cir.1983) (finding that copyright protection was available for the character of "Superman"). Courts have also extended copyright protec-

tion to "characters visually depicted in a television series or in a movie." *Olson,* 855 F.2d at 1452 (citations omitted).

In this case, the Court acknowledges that both *Echo of Lions* and "Amistad" contain an erudite, Black male abolitionist who provides a modern voice. For purposes of the present motion, the Court assumes that the Defendants could not copy in toto Plaintiff's fully realized character—Braithwaite. Plaintiff does not allege such wholesale copying, and in fact concedes that she "cannot own the idea of including a Black abolitionist in the telling of the Amistad story." Plf's. Reply at 31. Nevertheless, Plaintiff contends that the Defendants appropriated her protected expression by featuring a character who also serves the "dramatic function" of linking white and Black America, providing a contemporary Black voice to the Amistad story, and being active in supporting the Africans' cause. Plf's. Reply at 31–32.[8] The Plaintiff lists other similarities between the characters, *see* Plf's. Reply at 31–32, but they appear to the Court to be subsets or examples of the three functions just listed.

Nevertheless, the Court finds that a general skeleton (defined by function) of such a literary character cannot suffice to establish a character that is "especially distinctive" and therefore protectable. *Olson,* 855 F.2d at 1452. Thus, Plaintiff has not established a reasonable probability of success on her claim that such a character—one who performs a function or role—is entitled to copyright protection.

The Court additionally notes that even if Plaintiff first created the "idea" of using this character as a voice or link, she has failed to demonstrate a probability of success in establishing a substantial similarity between Braithwaite and Joadson. *See* 17 U .S.C. § 102(b) (noting that copyright protection does not extend to ideas or concepts); *Warner Bros. v. American Broadcasting Cos.,* 654 F.2d 204, 208 (2d Cir.1981) ("It is axiomatic that copyright protection extends only to the expression of the author's ideas, not to the idea itself.").

---

8. As noted above, the Defendants contest the last claimed similarity.

As noted, Braithwaite is a wealthy land owner and print shop operator whose large, prosperous family has been in America for over 200 years. Joadson, in contrast, is a runaway slave with no background of family wealth. Moreover, Joadson, unlike Braithwaite, plays a significant role in assisting the Africans' defense by searching for evidence and urging John Quincy Adams to take the case. Finally, Plaintiff presents no evidence that Defendants copied Braithwaite's dialogue for Joadson's character. The Court located and considered the "Amistad" scenes in which Joadson speaks to assist the defense. *See* Henderson Decl., Exh. B at 45–50, 52–55, 77, 85, 90–91, 98–104, and 105. Significantly the Court could not locate any comparable scenes in Plaintiff's book. In what is apparently the only other "Amistad" scene in which Joadson speaks,[9] he confronts Tappan. Henderson Decl., Exh. B, at 161. The Court did not find a similar scene in Plaintiff's book. It is true that Joadson *appears* in scenes set in courtrooms in both Plaintiff's book and "Amistad." The Court, however, considers scenes in which characters attend court proceedings to constitute *scenes à faire.*

Although Plaintiff has created a rich and fully developed character in Braithwaite, Plaintiff has not at this stage established a "substantial similarity" between the "expression" of Braithwaite and the expression of Joadson in "Amistad." For this reason, the Court cannot find "a likelihood that Plaintiff[ ] will succeed on the merits at trial on the issue of substantial similarity" between these characters. *Universal City,* 543 F.Supp. at 1140.[10]

### Cinque

Plaintiff contends that, unlike the historical factual record or any other treatment of these story, in both "Amistad" and *Echo of Lions* Cinque has a voice, understands what is happening to him, and contributes to his defense. Chase–Riboud Decl. ¶ 20. Moreover, Plaintiff contends that in both works Cinque remains true to his African roots and calls upon his ancestors for help in his legal battle. Chase–Riboud Decl. ¶ 38. Plaintiff contends that this portrait of Cinque is her creation because the historical record reflects that Cinque did not comprehend the judicial proceedings and did not materially assist in his defense. Chase–Riboud Decl. ¶¶ 19–21; Painter Decl. ¶¶ 22–24.

Defendants respond that Cinque is an actual historical character described in a number of historical works. Moreover, Defendants assert that "the film faithfully presents [Cinque] as he existed in history." Defs.' Opp. at 23 (citing Johnson Decl. ¶ 13).

It cannot be disputed that Plaintiff has no protectable interest in "historical and factual items." *Alexander,* 460 F.Supp. at 45. Thus, Plaintiff's claim must rest on her "creation" of a Cinque who is not reflected in the historical record. At this early stage of the proceedings, neither party has provided the Court with compelling proof defining the "historical" Cinque.

In this case, it is apparent that the Cinque in "Amistad" is active, not passive, heroic, not submissive, and remains true to his Mende culture, rather then adopting Christianity. Such a characterization of Cinque is far more representative of the Cinque portrayed in *Echo of Lions* than the Cinque in *Black Mutiny,* which Defendants allegedly relied on in creating their film. Nevertheless, even if Plaintiff's Cinque is not based on the historical record, Plaintiff has not established a reasonable probability of success on her claim that her "fictionalized" Cinque is entitled to copyright protection. In brief, Plaintiff has not demonstrated that her Cinque embodies "more than an unprotected idea." *Walt Disney,* 581 F.2d at 755. While the Court acknowledges that both *Echo of*

---

**9.** Joadson also visits the Africans in jail, but has little dialogue (other than "I don't understand") in this scene.

**10.** Because Plaintiff has not established a reasonable probability of success that her character is entitled to copyright protection, or that a substantial similarity exists between Braithwaite and Joadson, the Court need not determine the factu-

al dispute as to the origins of each character. For example, Plaintiff has created Braithwaite, in part, based on letters, speeches, and writings of Frederick Douglass. Shaeffer Decl., Exh. 108, *Echo of Lions,* at 375; Suber Decl. ¶ 44. In contrast, Defendants contend that Joadson is based on a composite of different Black abolitionists. *See* Debbie Allen Decl. ¶ 7; Suber Decl. ¶ 43; Johnson Decl. ¶ 11.

*Lions* and "Amistad" contain a Cinque with a "voice" and that he remains true to his African roots, the Court finds that such a character is not "especially distinctive." *Olson,* 855 F.2d at 1452. Thus, at this preliminary stage, the Court cannot conclude that Plaintiff has established a reasonable probability of success on her claim that her "image" of Cinque is entitled to copyright protection.

Moreover, even though both works contain a Cinque with a "voice" who remains true to his roots, the expression of Cinque differs in the two works. In "Amistad" Cinque tells John Quincy Adams that he will call on his ancestors for help in his legal battle. In *Echo of Lions,* on the other hand, Cinque merely thinks to himself that Mendes believe their destiny is based on "the behavior of their ancestors" and if they have been "just men," then "we can call on them for help." Shaeffer Decl., Exh. 108, *Echo of Lions,* at 249. Furthermore, Cinque's thoughts are expressed not in the context of his own battle for freedom, but in the midst of a conversation with Vivian Braithwaite about Covey. The Defendants also note that in "Amistad," Cinque makes actual suggestions for his defense. In *Echo of Lions,* however, Cinque does not make suggestions for his defense, although he reads a book to understand the proceedings. The book also does not indicate that Cinque poses questions to aid his defense. Suber Decl. ¶ 71. Finally, in "Amistad," Cinque apparently speaks only six words in English. However, his ability to speak and understand English is apparently much greater in Echo of Lions. Shaeffer Decl., Exh. 108, *Echo of Lions,* at 299–300. Because each work appears to express Cinque differently, the Court cannot conclusively state at this early stage that Plaintiff has met her burden of establishing a probability of success on the merits of her claim that substantial similarity exists between these characters.

### The Relationship Between John Quincy Adams and Cinque

Plaintiff contends that both works contain a meeting of these two men in which both men express their respect for each other. Plaintiff asserts that in both works the men have a long conversation during which Cinque gives Adams a theme for his oral argu-

ment. Chase–Riboud Decl. ¶¶ 21–22, 39. Moreover, Plaintiff contends that a meeting in which the men approach each other as equals could not have happened in history. Chase–Riboud Decl. ¶ 21; Painter Decl. ¶ 22.

Although the historical record reflects that Adams and Cinque actually met, *see* Johnson Decl. ¶ 8, the Court agrees with Plaintiff that the meetings between Cinque and Adams in both works do not constitute *scenes à faire, see* Plf's. Mot. at 20; *see also Alexander,* 460 F.Supp. at 45, and do not appear at this time to be based on the sparse historical record. *See id.* at 44–45.

The Defendants note, however, that the meetings in each work are significantly different. For example, in "Amistad," Cinque does not speak English during the meeting. In the book, on the other hand, Cinque speaks some English and discusses religion and politics with Adams at length. Suber Decl. ¶ 83; Shaeffer Decl., Exh. 108, *Echo of Lions,* at 299–300. Moreover, the meeting in "Amistad," unlike the version in the book, includes a sequence in which Cinque is deeply moved when he sees an African violet that reminds him of home. Finally, in "Amistad," the discussion with Adams is structured differently than that in the book, and is climaxed by Cinque's invocation of assistance from his ancestors. None of this appears in *Echo of Lions.*

The Court finds that the *idea* of a meeting between Adams and Cinque as one between men of mutual respect is not subject to copyright protection. *See* Plf's. Reply at 37 n. 25 ("Chase–Riboud agrees that it has no claim to the idea of a meeting between Adams and Cinque."); *see also Hoehling,* 618 F.2d at 977 ("To avoid a chilling effect on authors who contemplate tackling an historical issue or event, broad latitude must be granted to subsequent authors who make use of historical subject matter, including theories or plots."). Because of the substantive differences in the expressions of the meeting in the two works, the Court cannot conclude that "there is a likelihood that Plaintiff [ ] will succeed on the merits at trial on the issue of substantial similarity" between these two meetings. *Universal City,* 543 F.Supp. at 1140.

*First Civil Rights Trial*

Plaintiff contends that no work other than *Echo of Lions* depicts this story from the vantage point of civil rights. Plf's. Mot. at 21. Plaintiff notes that the Africans participate in their fate and the case is transformed from one involving property law into a case involving civil rights. Plf's. Reply at 40; Chase–Riboud Decl. ¶ 6.

Defendants counter that an examination of the historical record reveals that the case involved more than mere "property rights." Suber Decl. ¶ 129. Moreover, they contend that "Amistad" deals with legal issues and Adams' argument before the Supreme Court as they actually existed in history. Def's. Opp. at 32–33.

Based on the factual dispute, the Court cannot conclude that Plaintiff has established that she has a probability of success on her copyright infringement claim based on a protectable expression in the treatment of this case as the first civil rights case.

*Title*

Plaintiff notes that her book is entitled *Echo of Lions* while an early version of the screenplay was entitled *The Other Lion.* In this case, however, Defendants' use of a similar title on an early version of the screenplay, at most constitutes circumstantial evidence of copying. It is of little value in determining whether the two works are substantially similar.

"[T]itles may not claim statutory copyright." *Dr. Seuss,* 109 F.3d at 1399 (citing *Nimmer on Copyright,* § 2.6, at 2–185–187). Moreover, "[c]opying deleted or so disguised as to be unrecognizable is not copying." *See v. Durang,* 711 F.2d 141, 142 (9th Cir.1983) (finding earlier drafts irrelevant to the question of infringement). A defendant that actually uses a plaintiff's work "may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's." *Warner Bros., Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 241 (2d Cir.1983).

The Court need not determine the validity of Defendants' claim that the earlier version of the screenplay came from "Sierra Leone" or from a poem in *Black Mutiny.*[11] *See* Defs.' Opp. at 25. In this case, the title of the movie as released bears no resemblance to *Echo of Lions.* Thus, this evidence is not sufficient to warrant the issuance of a preliminary injunction.

*The Destruction of a Slave Colony*

Plaintiff contends that the Defendants' portrayal of the contemporaneous destruction of a slave colony with the rendering of the United States Supreme Court decision freeing the Africans constitutes impermissible copying. Plf's. Reply at 41.

Defendants note, however, that the portrayal of the events in the two works is not substantially similar. In "Amistad," the destruction occurs as a British cruiser fires its cannons to knock down a stone fortress. In Plaintiff's book, however, a British captain burns down the slave pens with the permission of the local African King.

Based on these contentions, the Court cannot conclude that Plaintiff has met her burden of demonstrating a probability of success that a substantial similarity exists between. Again the expression of the destruction of a slave fortress appears to be unique in each work.

*Covey Speaks Near-perfect English*

The parties also dispute whether Covey speaks perfect English. Plaintiff contends that the historical record reflects that Covey had difficulty with English. *See, e.g.,* Shaeffer Supp. Decl., Exh. H. at 173 (noting Covey's difficulty in understanding questions during court proceedings). The Defendants counter that *Black Mutiny* depicts "Covey as speaking perfect English." Suber Decl. ¶ 100. The parties do not dispute, however, that in "Amistad" and *Echo of Lions,* Covey actually speaks perfect English. Based on the disputed nature of Covey's historical ability to understand English, Plaintiff has not

11. Interestingly, Chapter Three of *Black Odyssey,* another book which Defendants contend that they consulted as a resource, is entitled "Lions of the Day."

established a probability of success of proving substantial similarity.

### Cinque Has One Child

Plaintiff also contends that an historical "error" present in *Echo of Lions* was copied in "Amistad." Specifically, Plaintiff's novel allegedly depicts Cinque with one child, when in reality he had three. At this stage, however, this contention appears to be of little consequence. First, in Plaintiff's work, Cinque has two children and his first wife is pregnant with his third child. Whitmore Decl., ¶ 70. Thus, it appears that Plaintiff's work portrays the historical facts. Moreover, "Amistad" simply briefly depicts Cinque's wife with a young boy. As the record stands, the Court cannot conclude that Cinque in "Amistad" had only one child or that "Amistad" copied an historical error from *Echo of Lions*.

### Ending Tied to the Civil War

Plaintiff asserts that the ending of the two works contain the same unique expression—"a voice traveling back from Africa and a shot of a civil war battle." Plf's. Reply at 37. Plaintiff agrees that she "has no claim to the idea of linking the Civil War to the entire Amistad affair." Plf's. Reply at 39. Plaintiff contends, however, that there is an identity of expression in linking Cinque's return to Africa with a voice traveling back across the Atlantic to a symbol of the Civil War. Plf's. Reply at 39.

Again, at this stage Plaintiff has not established a probability of success on the merits based on this showing. Even if Plaintiff created the idea of linking Cinque's return to Africa with a voice traveling across the Atlantic and a symbol of the Civil War, the expression of these ideas is different in the two works. In Plaintiff's book, the relevant passage (or at least its interpretation) occurs thirty years after the trial, as Cinque is dying. In "Amistad," the scene occurs as Cinque is returning to Africa. Moreover, in "Amistad," it appears that the scene is tied to Adams' speech before the Supreme Court in which he states that if this case "leads to civil war, so be it. Let it be the last battle of the American Revolution." Given the unique treatment of this idea, the Court cannot con-

clude that Plaintiff has established a probability of success.

### Irreparable Injury

■ Because Plaintiff has failed to demonstrate a probability of success on the merits, no presumption of irreparable injury arises. *See Cadence Design Sys., Inc. v. Avant! Corp.,* 125 F.3d 824, 826 (9th Cir. 1997) (recognizing that "a presumption of irreparable injury arises if the plaintiff is able to show a likelihood of success on the merits of its copyright infringement claim"). Nevertheless, Plaintiff contends that she has suffered irreparable injury because the Defendants have "virtually destroyed the market for film rights to [her] novel." Plf's. Mot. at 31. Although it may be unlikely that another film or television studio will seek to obtain the right to *Echo of Lions,* the lack of a film or television market for her book speaks to money damages. Any harm arising from that particular injury may be redressed should Plaintiff ultimately prevail on the merits of her claim.

Plaintiff also contends that she has been deprived of the opportunity to receive credit for raising, "in her own unique fashion, public consciousness regarding slavery." Plf's. Mot. at 31. Undoubtedly, nation-wide and world-wide distribution and viewing of the film with an acknowledgment of Plaintiff's contribution could greatly enhance the credit she receives in her efforts and contribution to this subject. The denial of a preliminary injunction deprives Plaintiff of a further opportunity to receive even greater credit for her role in raising public consciousness about slavery. Nevertheless, Plaintiff's book has been in print since 1989, has sold over 500,000 copies, has been translated into five languages, and is currently available in public libraries. Chase–Riboud Decl. ¶ 28. Thus, it appears that Plaintiff has already received substantial credit for her important contributions in this area.

For this reason, the Court finds that Plaintiff has failed to make a sufficient showing that the denial of a preliminary injunction constitutes irreparable injury.

### Serious Questions & Balance of Hardships

At this early stage, the Court cannot conclude that Plaintiff has established a probability of success. Nevertheless, based on the analysis related to Plaintiff's probability of success, the Court determines that Plaintiff has raised serious questions going to the merits of her copyright infringement claim. Thus, Plaintiff is entitled to a preliminary injunction if the Court finds that Plaintiff establishes that the "balance of hardships tips sharply in [her] favor." *International Jensen*, 4 F.3d at 822.

Plaintiff contends that she has suffered irreparable injury because the Defendants have "virtually destroyed the market for film rights to [her] novel," Plf's. Mot. at 31, and that she stands to lose "licensing income and potential to the copyright's long-term value." Plf's. Reply at 32. Plaintiff also contends that she has been deprived of the opportunity to receive credit for raising, "in her own unique fashion, public consciousness regarding slavery." Plf's. Mot. at 31; Plf's. Reply at 32.

On the other hand, Defendants have invested approximately $70–75 million in "Amistad." Hahn Decl. ¶ 5. Now, with the film's nation-wide release imminent, Plaintiff seeks to enjoin its release. Although copyright law "does not condone a practice of infringe now, pay later," *Woods v. Universal City Studios, Inc.*, 920 F.Supp. 62, 65 (S.D.N.Y.1996) (quotation omitted), the Court cannot find on the record before it that Plaintiff has met her burden of demonstrating that the "balance of hardships tips *sharply* in [her] favor." *International Jensen*, 4 F.3d at 822 (emphasis added). For this reason, the Court finds that Plaintiff is not entitled to a preliminary injunction

### IV. Conclusion

For all these reasons, the Court hereby DENIES Plaintiff's Motion for a Preliminary Injunction.

**SO ORDERED.**