**SONY PICTURES ENTERTAINMENT, INC., et al. Plaintiffs,**

v.

**FIREWORKS ENTERTAINMENT GROUP, INC., et al. Defendants.**

**And Related Cross Action**

**No. CV 01–0723ABC (AIJX).**

United States District Court, C.D. California, Western Division.

April 5, 2001.

Manatt, Phelps & Phillips, Seth A. Gold, Los Angeles, CA, for Plaintiffs.

Jeffrey S. Kravitz, Keith G. Wileman, Lord, Bissell & Brook, Los Angeles, CA, for Defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

COLLINS, District Judge.

Plaintiffs Sony Pictures Entertainment, Inc. ("Sony"), TriStar Pictures, Inc. ("TriStar"), and Zorro Productions, Inc.'s ("ZPI") (collectively "Plaintiffs") Motion for a Preliminary Injunction came on regularly for a hearing before this Court on March 26, 2001. This case arises out of a dispute between Plaintiffs and Defendants Fireworks Entertainment Group, Fireworks Communications Inc., Fireworks Productions, Inc., Paramount Pictures, and Mercury Entertainment (collectively "Defendants") about a television series, "Queen of Swords" ("QOS"). After considering the materials submitted by the parties, argument of counsel, and the case file,[1] the Court DENIES the request for a Preliminary Injunction.

1. The parties' filings related to this motion are voluminous. In addition to the Motion,

## I. BACKGROUND

The well known fictional character "Zorro" is at the center of this action. In 1919, Johnson McCulley ("McCulley") wrote the first Zorro story, which was serialized in a pulp fiction magazine entitled *All Story Weekly*. That first Zorro story is entitled, "The Curse of Capistrano," and it features Zorro, the masked avenger, who leads a double life in early Spanish California. McCulley's Zorro wears a black mask, sombrero and cloak, rides a horse and fights with a whip and a sword. (Curtis Decl. ¶¶ 8, 15(a),(b).) [2]

Plaintiffs allege that ZPI "owns all trademark rights and a number of copyrights in works depicting the character 'Zorro,'" and that ZPI's rights "stem directly from McCulley." (Mtn. 1; Gertz Decl. ¶¶ 2–14; Pl. Exh. 6 & 7.) Defendants, however, have presented evidence of a complicated history of ownership of rights to Zorro and McCulley's story. In 1920, McCulley allegedly assigned the rights in "The Curse of Capistrano," including all rights to Zorro, to Douglas Fairbanks, Sr. ("Fairbanks"). Fairbanks then produced and starred in the silent movie classic, "The Mark of Zorro." (Def.Exh. 29.) In 1925, McCulley confirmed his assignment of rights to Fairbanks. In 1929, McCulley assigned to Elton Corp. ("Elton"), a company controlled by Fairbanks, all the motion picture rights in and to "The Curse of Capistrano" expressly including the talking and sound motion picture rights. Like the earlier assignment, the 1929 assignment also included the copyright, any common law trademark rights, and any other property rights in and to the Zorro character. (Def.Exh. 29.) [3]

In 1949, McCulley allegedly assigned the same rights he had already assigned to Fairbanks and Elton in the 1920s to Mitchell Gertz. (Def. Exh. 29; Opp'n 1–2; Gertz Decl. ¶ 5.) Mitchell Gertz's alleged assignment was recorded in 1979. (Def. Exh. 29 at 17.) When Mitchell Gertz died in 1961, he left his estate to his children who later formed ZPI and transferred to ZPI all the rights and goodwill in Zorro that they had inherited as part of their father's estate and had created themselves. (Gertz Decl. ¶¶ 7–9.)

ZPI, Mitchell Gertz, and his children have granted many licenses for the character Zorro, including licenses for motion pictures, television programs and series, and comic books, over the last forty years. (Gertz Decl. ¶¶ 2–12; Pl. Exhs. 3, 5, 8.) ZPI's exclusive motion picture licensee is

Opposition, and Reply, the parties have filed and the Court has reviewed and considered much more, including: Plaintiffs' more than seventy exhibits (including but not limited to the film "Mask of Zorro," the first two QOS episodes, still photos, "Lady Rawhide" comic book excerpts, and various Internet postings), and approximately fifteen declarations; and Defendants' nearly forty exhibits (including but not limited to seven additional QOS episodes, the silent film, "The Mark of Zorro," the cliffhanger, "Zorro's Black Whip," and additional "Lady Rawhide" comic book excerpts) and a dozen or so declarations. Plaintiffs also filed a consumer survey which Defendants critiqued.

**2.** The Court has reviewed all the objections to the evidence upon which it has relied. To the extent that the Court has relied on that evidence in this order, the objections are OVERRULED on the merits. Objections to evidence upon which the Court does not rely are OVERRULED as moot, except as indicated herein.

**3.** Notably, the initial term of the copyright for the silent picture, "The Mark of Zorro" expired in 1948. No renewal was filed. Even assuming that the copyright for this silent film was renewed, however, the second term expired in 1995. Therefore, all of the essential character elements of Zorro expressed in "The Curse of Capistrano" and the silent picture, "The Mark of Zorro" moved into the public domain when the renewal terms of those copyrights expired.

TriStar, which is substantially owned and controlled by Sony. Pursuant to its license, Sony–TriStar produced and released in July 1998 the motion picture, "The Mask of Zorro" ("MOZ") which starred Anthony Hopkins, Antonio Banderas, and Catherine Zeta–Jones. (Goldstine Decl. ¶¶ 2–4, Exh. 12.) MOZ has grossed over ninety-five million dollars in the United States and 250 million dollars worldwide in its theatrical release. Sony–TriStar released MOZ on video in January 1999, and has sold over 5.4 million VHS cassettes and DVDs. (Goldstine Decl. ¶¶ 5–6.) It released MOZ on satellite and cable television, where it presently remains in rotation. MOZ was broadcast over the CBS network on February 25, 2001. (Goldstine Decl. ¶ 7.) Over six million dollars were spent advertising MOZ in newspapers, on television, billboards, and the Internet. (Goldstine Decl. ¶¶ 4, 6.) MOZ was extensively advertised and promoted with posters and print ads that featured a standing silhouette of Zorro dressed in black and brandishing a sword. (Goldstine Decl. ¶ 7; Pl. Exh. 13.)

Regarding ZPI's licensed comic books, new characters were created to interact with Zorro, one of whom is "Lady Rawhide" ("LR") who appears in a comic book by the same name. Plaintiffs describe Lady Rawhide as "a young unmarried Spanish noblewoman who, to exact revenge for the burning and blinding of her brother by Spanish troops seeking Zorro in old California, dons a mask and fights with a horse, whip and sword." (Mtn.1–2.)

In or about August 1999, Defendants began developing a television series that was allegedly a "daughter of Zorro concept" with a female sword-using protagonist. (Gertz Decl. ¶¶ 17, 18.) This series, QOS, involves the activities of Tessa Alvarado, an aristocratic young woman who returns to California from Spain in the early 1800s upon news of her father's death. She wears a black lace mask, a relatively low-cut long-sleeved black shirt, and black pants to fight against the corrupt government installed in California. Defendants used actual clips from the MOZ in a "pitch film" shown to potential purchasers of QOS no later than November 1999 and at the NATPE convention in January 2000.[4] (Itkin Decl. ¶¶ 2–4; Gertz Decl. ¶¶ 19–29; Kaplan Decl. ¶ 6; Exhs. 24–25; Mosko Decl. ¶¶ 2–3.) The first episode of QOS aired in October 2000. (Lee Decl. ¶¶ 19–20; Exhs. 27 & 28.) Twenty-two episodes of QOS were completed, and as of March 11, 2001, fifteen episodes had been shown on television. (Abramowitz Decl. ¶ 5.)

On January 24, 2001, Plaintiffs filed an action for damages and injunctive relief because of the injuries allegedly caused by Defendants' QOS television series. Plaintiffs' claims are for copyright infringement, false designation of origin under the Lanham Act, common law unfair competition, and statutory unfair competition. Plaintiffs allege that Defendants, through the television series QOS, have "copied protectable elements from Plaintiffs' famous 'Zorro' character and 'Zorro' related works in a television series entitled 'Queen of Swords.'" (Compl.¶ 1.) Defendants' actions, Plaintiffs allege, "have misled and are misleading the public into believing that their television series is endorsed, approved by, or otherwise, associated with

---

4. Plaintiffs allege at paragraph 16(a) of their Complaint that "Defendants literally copied clips from Sony's 'The Mask of Zorro' which depict Catherine Zeta–Jones for use in a 'pitch kit' that was shown to prospective buyers of the Series, thereby violating Sony's copyright in that film[.]" Plaintiffs do not allege, however, that these clips are still being shown. The use of the film clips as part of a "pitch kit" is therefore not at issue for purposes of this preliminary injunction.

Plaintiffs." (*Id.*) Plaintiffs seek injunctive relief to stop Defendants' conduct and monetary damages to remedy the harm Defendants have allegedly already caused.[5]

On February 26, 2001, Plaintiffs filed the instant Motion for a Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65. Plaintiffs argue that they are entitled to a Preliminary Injunction precluding Defendants from:

(1) copying or otherwise infringing Plaintiffs' copyrights in the theatrical motion picture 'The Mask of Zorro' and certain comic books depicting 'Zorro' and other characters, especially the character 'Lady Rawhide;' (2) using, attempting to use, or causing to be used, either directly or indirectly, any characters, trade dress, or story elements confusingly similar to those associated with the character 'Zorro;' (3) otherwise engaging in acts of copyright infringement, trademark infringement or unfair competition with regard to the character 'Zorro;' and (4) assisting, aiding or abetting any other person or business entity from performing or attempting to perform any activities enjoined herein.

(Notice of Mtn. 2.) Plaintiffs argue that the Preliminary Injunction should be granted because they will likely succeed on their copyright infringement claims and on their unfair competition claims.[6]

Defendants opposed Plaintiffs' Motion for a Preliminary Injunction on March 12, 2001. Defendants argue that Plaintiffs are not entitled to a Preliminary Injunction because they have not shown a likelihood of success on the merits and cannot establish irreparable harm. Plaintiffs replied on March 19, 2001. On March 26, 2001, the Court held oral argument on this Motion.

## II. LEGAL STANDARDS

### A. Preliminary Injunction Standard

■ To obtain a preliminary injunction, a plaintiff must show "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Id.* (internal quotations omitted.) "Thus, the greater the relative hardship to [a plaintiff], the less probability of success must be shown." *Id.*

■ In a copyright infringement claim, a plaintiff only needs to show "a reasonable likelihood of success on the merits to get a preliminary injunction" because a presumption of irreparable harm arises from such a showing. *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1109 (9th Cir.1998); *accord Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1094 (2d Cir.1977) (reiterating that a court should issue a preliminary injunction where the plaintiff makes a prima facie showing of copyright infringement). Similarly, in a trademark or unfair competition case, "once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted." *Vision Sports, Inc. v. Melville, Corp.*, 888 F.2d 609, 612 n. 3 (9th Cir.1989) (citation omitted).

---

**5.** On March 2, 2001, Defendants counterclaimed against Plaintiffs for invalidity of trademarks and service marks, invalidity of copyrights, declaratory relief, and statutory and common law unfair business practices.

**6.** Plaintiffs' unfair competition claims appear to be based on Defendants' alleged trademark and trade dress violations which Plaintiffs argue confuse consumers and cause them to believe that QOS is in some way associated with Plaintiffs. (Mtn.15–16.)

## B. Copyright Infringement Standard

 "To establish copyright infringement, Plaintiff must prove (1) that Plaintiff owned the copyrights and (2) that Defendants copied Plaintiff's copyrighted work." *Chase–Riboud v. Dreamworks, Inc.*, 987 F.Supp. 1222, 1224 (C.D.Cal.1997) (citations omitted). " 'Copying' is composed of two parts: '(1) circumstantial evidence of the defendant's access to the copyrighted work; and (2) substantial similarity between the copyrighted work and the defendant's work.' " *Id.*

 The test to determine substantial similarity between works has two parts. The first part is the "extrinsic" inquiry, and it is used to determine whether there is a similarity of ideas. *Sid & Marty Krofft Television Prods., Inc. v. Mc-Donald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977). "The objective extrinsic test is based on specific expressive elements and focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters and sequence of events' in two works." *Chase–Riboud*, 987 F.Supp. at 1225 (citation omitted). The extrinsic inquiry allows the Court to engage in "analytic dissection," thereby focusing on "isolated elements of each work to the exclusion of other elements, combination of elements, and expressions therein." *Id.* n. 3 (citation omitted).[7]

 The second part of the substantial similarity test is the subjective "intrinsic" inquiry, which "asks if an 'ordinary reasonable person' would perceive a sub-stantial taking of protected expression." *Id.* at 1226 (citations omitted). "The 'intrinsic' test looks for substantial similarity in the 'total concept and feel' of two works." *Id.* (citation omitted). The intrinsic or subjective inquiry is usually reserved for the trier of fact; however, the Court may properly consider it at the preliminary injunction stage because it is relevant to whether Plaintiffs will ultimately prevail on the merits of their claim. *Id.* at n. 4 (citation omitted).[8]

 Copyright law protects an author's expression; facts and ideas within a work are not protected. *Shaw*, 919 F.2d at 1356 (citation omitted). "Copyright protection does not extend to historical or contemporary facts, material traceable to common sources or sources in the public domains, and scenes a faire." *Walker v. Time Life Films, Inc.*, 615 F.Supp. 430, 435 (S.D.N.Y.1985). "[T]he party claiming infringement may place 'no reliance upon any similarity in expression resulting from' unprotectable elements." *Apple Computer Inc.*, 35 F.3d at 1446. Therefore, to the extent a plaintiff claims copyright infringement based on unprotected aspects of a work, those claims necessarily fail.

## C. Unfair Competition/Trademark Infringement Standard

 "The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to the source." *Dr. Seuss Enterprises, L.P. v. Penguin Books U.S.A., Inc.*, 109 F.3d 1394, 1404 & n. 12 (9th Cir.1997) (citation

7. As the Ninth Circuit has held, "Because only those elements of a work that are protectable ... can be compared when it comes to the ultimate question of illicit copying, we use analytic dissection to determine the scope of copyright protection before works are considered 'as a whole.' " *Apple Computer Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442–43 (9th Cir.1994).

8. Notably, "because the criteria incorporated into the extrinsic test encompass all objective manifestations of creativity, the two tests are more sensibly described as objective and subjective analyses of expression." *Shaw v. Lindheim*, 919 F.2d 1353, 1357 (9th Cir.1990).

omitted). Plaintiffs' claims for unfair competition are pursuant to section 43(a) of the Lanham Act, California Business and Professions Code section 17200, and common law. " 'Likelihood of confusion' is the basic test for both common law trademark infringement and federal statutory infringement." *Id.* at 1403. Similarly, to state an unfair competition claim under California statutory law, "one need only show that 'members of the public are likely to be deceived.' " *Bank of the West v. Superior Court of Contra Costa County,* 2 Cal.4th 1254, 1267, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992).

■■ "In determining whether confusion between related goods is likely, the following factors are relevant: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and, (8) likelihood of expansion of the product lines." *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979).

### III. ANALYSIS

### A. Copyright Claims

#### 1. Plaintiffs' Ownership of Copyrights

■■ Plaintiffs have presented their copyright registrations for MOZ and the LR comics at issue in this case, including: "Zorro: Men Aren't The Only Ones With Dual Identities," "Lady Rawhide—Book 1, Other People's Blood," "Lady Rawhide—Book 3: It Can't Happen Here," and "Lady Rawhide—The Night They Killed Lady Rawhide." (Compl. Exhs. B & C.)[9] The Court therefore assumes, for purposes of this preliminary injunction, that Plaintiffs have shown the requisite ownership in the copyrights at issue.[10]

It is undisputed, however, that Zorro appears in works whose copyrights have already expired, such as McCulley's story "The Curse of Capistrano" and Fairbanks's movie, "The Mark of Zorro." As these works have already entered the public domain, the portions of MOZ and LR comic books that use the character Zorro, elements from McCulley's story, or elements from Fairbanks' movie, cannot be infringed except as far as MOZ or LR have incorporated original elements.

#### 2. Defendants' Copying

Assuming that there are valid copyrights in MOZ and the LR comic books, the Court next must determine whether there is substantial similarity between those works and QOS. To determine whether similarity exists such that a preliminary injunction should issue, the Court conducts the objective, extrinsic test and

---

**9.** Plaintiffs concede in their Reply that they own no copyright in the character Zorro. (Reply 2.)

**10.** Defendants have strenuously argued that McCulley's assignment to Gertz and Gertz's recording thirty years later are invalid because of McCulley's earlier assignment to Fairbanks. Defendants also argue that ZPI's failure to mention on the copyright registrations that the LR comic books were derivative works may mean that the registrations are invalid. (Opp'n 20.) Plaintiffs respond that because ZPI had the authority to create the comic books, Defendants' derivative works argument fails. (Reply 8–9.) Additionally, Plaintiffs argue that Defendants are estopped from arguing that MOZ and the comic books are derivative because of Defendants' arguments that Zorro and the first works featuring Zorro are in the public domain for copyright purposes. (Reply 9.) For purposes of this Motion for Preliminary Injunction, the Court will assume that Plaintiffs have valid copyrights in the works at issue. The parties may revisit these issues in later motions, however, if they wish.

the subjective, intrinsic test. *Shaw*, 919 F.2d at 1362–63.[11]

Plaintiffs argue that the QOS series, particularly the first two episodes, infringe Plaintiffs' copyright in MOZ. Plaintiffs also argue that the QOS series, particularly the use of the characters QOS, Mary Rose and Serpente, infringe Plaintiffs' copyrights in LR.[12]

### a. Objective, Extrinsic Test Applied

#### (1) Characters and Dialogue

##### (a) MOZ and QOS

Plaintiffs argue that Tessa Alvarado/QOS is an amalgamation of three MOZ characters: Elena, Diego (the Zorro played by Anthony Hopkins, "Hopkins Zorro,"), and Murietta (the Zorro played by Antonio Banderas, "Banderas Zorro").[13] Plaintiffs also argue that Defendants copied MOZ's Don Montero to create QOS's Colonel Montoya, and that they copied MOZ's Harrison Love to create QOS's Marcus Grisham.

##### (i) Tessa Alvarado/QOS Amalgam

Plaintiffs' hypothesis is that Tessa Alvarado/QOS is an amalgam of three characters from MOZ: Elena, Hopkins Zorro, and Banderas Zorro. They first argue that Tessa Alvarado/QOS and Elena look similar, have aristocratic fathers, were raised in Spain where they learned to fight with swords, and perceive injustice in the treatment of the less fortunate upon returning to Old California. (Curtis Decl. ¶¶ 22(a).) Second, Plaintiffs posit that Tessa Alvarado/QOS also resembles Hopkins Zorro (de la Vega) because she is an aristocrat. (*Id.*) Third, they urge that she also resembles Banderas Zorro because she is "traumatized by the death of a loved one[,] motivated by a desire for revenge, and assisted by a wise counselor (de La Vega in MOZ and Marta in QOS)." (*Id.*; Mtn. 7.) Additionally, Plaintiffs point to Tessa Alvarado's resemblance to Hopkins Zorro and Banderas Zorro because as QOS, she wears a black costume and black mask, "virtually identical to the classic Zorro costume." (Curtis Decl. ¶ 22(a).) [14]

Defendants point out in their papers that Plaintiffs cite no authority for the proposition that an amalgam of traits taken from different characters can constitute infringement. (Opp'n 10.) At oral argument, Defendants directed the Court's attention to several cases that stand for the proposition that a defendant's amalgamation of plaintiff's characters into one character can be infringing if the one character fulfills the same plot roles as the plaintiff's

---

11. Defendants do not dispute that they had access to MOZ and the LR comic books at issue in this case. Defendants' access to Plaintiffs' works is a factor to be considered in favor of Plaintiffs. *Id.* at 1361–62.

12. Plaintiffs appear to argue that Defendants have infringed the copyrights of Plaintiffs' characters, LR, Scarlett Fever, and Machete, as well as the copyrights in the comic books. To the extent that Plaintiffs are unable to show similarity between the characters in QOS and the characters in LR, however, Plaintiffs are also unable to show a similarity between QOS and the comic book LR.

13. The Court encountered analytical difficulties when attempting to apply the objective test to Plaintiffs' "amalgamation theory."

One obvious area of difficulty is in the comparison of the characters, but there are also difficulties in comparing theme, plot, and sequence of events because the Court must constantly juggle all three characters which Plaintiffs allege Defendants copied. These comparisons can lead to comic or absurd results. For example, when Banderas Zorro dances passionately with Elena, Tessa Alvarado/QOS must be dancing passionately with herself.

14. Even though the QOS's costume is black, it differs substantially from the black Zorro costumes in MOZ. QOS's mask is made of thin black lace, as opposed to the masks in MOZ which are made of opaque black fabric. Additionally, QOS, unlike either Zorro in MOZ, never wears a hat or a cape with her costume.

original characters did. *Olson v. National Broadcasting Co., Inc.*, 855 F.2d 1446, 1451 (9th Cir.1988); *Universal City Studios, Inc. v. Film Ventures Int'l, Inc.*, 543 F.Supp. 1134, 1137–38 (C.D.Cal.1982); *Rose v. Connelly*, 38 F.Supp. 54, 56 (S.D.N.Y.1941). Defendants argued that because Tessa Alvarado/QOS does not fulfill the same plot roles as Elena, Hopkins Zorro, and Banderas Zorro, Plaintiffs' amalgamation theory fails.[15] The Court agrees.

There are superficial similarities between Tessa Alvarado/QOS and Plaintiffs' three characters; however, Tessa Alvarado/QOS does not fulfill the same plot roles that they do. While it is true that Tessa Alvarado and Elena return to Old California after having spent time in Spain, and both free peasants from working in a mine, these are minor similarities. In terms of plot roles, the two characters are quite different. For example, MOZ's Elena is the daughter of Hopkins Zorro; however, she believes until almost the end of the movie that she is the daughter of Don Montero, who kidnaped her from Hopkins Zorro and imprisoned her father for many years. Elena's mistaken belief in her parentage is shattered and the truth revealed when Hopkins Zorro confronts Don Montero about his lies in Elena's presence, and thus begins to take his revenge on the man who killed his wife and stole his daughter. By the end of the movie, Elena learns that Hopkins Zorro is her real father. The truth is revealed too late, however, to allow the development of their relationship, as Hopkins Zorro is fatally wounded during the battle at the mine. In another plot development, Elena captures the heart of Banderas Zorro and becomes the mother of Banderas Zorro's child—a boy who will carry on the Zorro tradition. Tessa Alvarado/QOS performs none of these plot roles in QOS.

Tessa Alvarado/QOS also fails to fulfill the plot roles of the two Zorros, even though she wields her sword against evildoers. Plaintiffs themselves point to the significance of Hopkins Zorro's role as a wise counselor, and argue that Marta, Tessa Alvarado/QOS's servant, fulfilled that role in QOS. (Mtn.7.) Hopkins Zorro instructed Banderas Zorro in sword-fighting and the art of becoming a Spanish gentleman. Banderas Zorro, in turn, was the student, overly eager to avenge his brother's death and the ultimate successor to the title, Zorro, upon Hopkins Zorro's death. Tessa Alvarado/QOS fulfills neither the teacher role of Hopkins Zorro nor the willing student role of Banderas Zorro. Marta is not Tessa Alvarado/QOS's sword fighting instructor, but rather a mystic who reads tarot cards. Although Marta and Tessa Alvarado/QOS are supposedly servant and mistress, their relationship resembles modern-day friendship rather than either a mistress-servant or teacher-student relationship. Moreover, unlike Banderas Zorro, Tessa Alvarado/QOS is an aristocrat who already knows how to act like one. Finally, Tessa Alvarado/QOS does not have a love interest comparable to the passionate love interest between Elena and Banderas Zorro in MOZ. Tessa Alvarado/QOS appears in a later episode to have a developing love interest in the mysterious Dr. Helm, a major character in QOS who is not present in MOZ.

Because Plaintiffs have not shown, and the Court has not found, how Tessa Alvarado/QOS fulfills the same plot roles as Elena or the two Zorros in MOZ, the

---

**15.** At oral argument, Plaintiffs maintained that the similarity between Tessa Alvarado/QOS and the three MOZ characters is enough for the Court to find infringement. Plaintiffs did not, however, attempt to refute Defendants' argument that Tessa Alvarado/QOS fails to fulfill the plot roles of the other three characters.

Court does not find Plaintiffs have established a "substantial similarity" between Tessa Alvarado/QOS and an amalgam of Elena, Hopkins Zorro, and Banderas Zorro.

### (ii) Montero–Montoya

Plaintiffs also argue that MOZ's Don Montero and QOS's Colonel Montoya are substantially similar. Plaintiffs point out that Montero and Montoya share similar names and appearances and are both appointed military rulers. (Lee Decl. ¶ 7; Pl. Exh. 35; Curtis Decl. ¶ 22(a).) Plaintiffs note that the two men share "similar character traits of dishonesty, ruthless ambition, and disregard for human life ... display a superficial veneer of breeding civility ... [and plan] to establish an empire in California." (Curtis Decl. ¶ 22(a).) Defendants, however, correctly point out that Montero was forced to give up his military appointment and leave California, after which he returned as a don for most of MOZ. Montoya, on the other hand, is the active military commander of a town, and he is never forced to leave or to take on any other role. As such, Montoya is already in charge, and his primary goal is to become more wealthy by taking over residents' land at every opportunity. Montero's goal, on the other hand, is to rule all of California by purchasing it from General Santa Ana with California-mined gold. Clearly, Montero's goal is much more ambitious than Montoya's. Additionally, Montero is obsessed with Zorro from the beginning of MOZ. Montero wanted Hopkins Zorro's wife for his own, he stole Hopkins Zorro's infant daughter, after Hopkins Zorro's wife was killed, to raise her as his own, and for most of the movie, he is consumed with a single-minded search for Zorro. Montoya, on the other hand, clearly wants to capture the QOS, but he usually appears more frustrated and annoyed than obsessed. Finally, Montero pretends to be Elena's father, while Montoya plays no father role at all.

Therefore, while Montero and Montoya are both examples of a classic villain, in that they are ruthless and have disregard for human life, their qualities protectable by copyright, such as their motivations, are different and prevent this Court from finding substantial similarity between the two.

### (iii) Love–Grisham

Perhaps Plaintiffs' best argument for character similarity lies in the comparison of MOZ's Harrison Love and QOS's Marcus Grisham. Plaintiffs, however, again fall short of establishing the necessary substantial similarity between these two characters. As Plaintiffs point out, Love and Grisham are bearded expatriate American mercenary "Captains" who serve Spanish masters. (Curtis Decl. ¶ 22(a).) They have the same relationship with their respective masters, Montero and Montoya. (*Id.*) They are both highly trained and highly skilled military officers who "display a cheerful disregard for human life." (*Id.*; Mtn. 9.) Additionally, they both play a role in killing the family member whose death motivates the MOZ and QOS protagonists to later take action as Zorro or the QOS, respectively.

Most of these similarities, however, really just define Grisham and Love as secondary villains in MOZ and QOS. The Court has not found further similarities between them. Rather, the Court has noted significant differences between Love and Grisham. Unlike Love, whose background appears to be above suspicion, Grisham was thrown out of the military for misconduct. Grisham's master, Montoya, knows why he was kicked out, and the reason is serious enough to enable Montoya to essentially blackmail Grisham into obeying his orders. Grisham resents Montoya's power over him, and in a later episode, he reveals his disloyalty by stealing and withholding life-

saving medicine from Montoya.[16] Love, on the other hand, remains loyal to Montero throughout MOZ. Grisham is also a womanizer. He is involved in a "secret" affair with Senora Vera Hidalgo, the wife of Don Gaspar Hidalgo, and he also feigns interest in Tessa Alvarado, upon orders from Montoya, with the hope that she will marry him and he and Montoya can control her land. When Grisham's hopes are dashed by Tessa Alvarado's immediate rejection, Grisham shrugs and moves on. Love, on the other hand, shows a genuine romantic interest in Elena, who in turn prefers Banderas Zorro.

Finally, because Tessa Alvarado/QOS does not know that Grisham killed her father, she and Grisham do not engage in the kind of revenge battles that Banderas Zorro and Love do. Although the QOS fights Grisham, the sword-fight is a bantering one, and she foregoes an opportunity to kill him. These heated revenge battles between Banderas Zorro and Love are missing from QOS, and Grisham consistently tries to impress the ladies with his gallantry. It therefore appears that while Grisham and Love share common traits that exemplify the unprotected idea of a secondary villain, they are indeed different characters. Given their differences, the Court is unable to find the necessary substantial similarity between Grisham and Love to find infringement.

16. Grisham planned to blame the QOS for the theft and cause Montoya's death so that he, Grisham, could take over. Montoya ultimately recovers, discovers Grisham's treachery, but nevertheless inexplicably (except for the demands of a television series) allows him to remain in his position.

17. Defendants, rather than addressing whether these similarities exist, merely question the veracity of Plaintiffs' copyright in the LR comic books at issue.

### (iv) Dialogue

Plaintiffs' argument as to dialogue is particularly weak. There are no references to the word or character "Zorro" in QOS. In addition, Plaintiffs do not point to any dialogue copied from MOZ. Plaintiffs do argue that Montoya's reference to a part of the QOS's costume as the "skin of the fox" and his reference to QOS as "the fox" impermissibly *suggest* "Zorro," because the word "zorro" is Spanish for "fox." (Curtis Decl. ¶ 22(c).) Plaintiffs, however, do not allege that these references were copied from MOZ. Without copying, there can be no copyright infringement; therefore, the Court is unable to find that these references infringe.

### (b) LR and QOS

Plaintiffs also argue that QOS copied characters from LR. Specifically, Plaintiffs argue that QOS copied the following characters from LR: LR to create QOS; Scarlett Fever to create Mary Rose; and Machete to create Serpente.[17]

### (i) LR–QOS

The Court has examined the LR comic books and excerpts submitted in connection with this Motion for Preliminary Injunction.[18] The Court is unable to find significant similarity between the QOS characters and the LR characters. Other than the fact that LR and QOS have dual identities, itself an unprotectable concept, the Court finds no substantial similarity between LR and QOS. LR appears scanti-

18. The Court notes that to the extent that Plaintiffs claim that QOS somehow devalues the character Zorro because of its relatively poor production values as compared to MOZ, Plaintiffs' argument is ludicrous. Plaintiff ZPI has licensed lurid LR comic books featuring a breast-groping Zorro; a barely-clothed (and often naked,) well-endowed, and always seductively-posed LR; and, a blood-sucking woman named Carmelita, the illustrations of whom reveal her "vampire tendencies" in overtly sexually charged scenes.

ly clad in a red costume with red hair and QOS appears, by comparison, with dark hair, looking demure and almost fully covered in a black costume. Additionally, Plaintiffs' argument that LR and QOS "engage in highly sensual swordplay with their male antagonists," understates the constant, blatant sexual overtones to LR's actions and overstates by far the occasional, playful sensual undertones to QOS's actions. In fact, Plaintiffs' comparison comes close to misrepresentation of both characters.

### (ii) Scarlett Fever–Mary Rose

The Court is similarly unable to find substantial similarity between LR's Scarlett Fever and QOS's Mary Rose. Apart from the fact that they are both sword-wielding sea-women, another unprotectable idea, they are quite dissimilar. Scarlett Fever is a ruthless pirate, about LR's age, who has an obsession with, and takes great pleasure in, killing her enemies by stabbing them with a gangrenous weapon. Her behavior and dialogue are sexually charged. Mary Rose, on the other hand, is a mercenary sea captain who fought against pirates and has commissions from England and Spain. Rather than being a contemporary of the QOS, she is a wealthy widow of a certain maturity whose adult son has been arrested for killing a young woman. Mary Rose arrives in town following her son's arrest to discourage Tessa Alvarado from testifying against him at his trial. She does not engage in any sexual dialogue or metaphor. Her sole purpose is to save her son. In the course of the show, she first threatens but then befriends Tessa Alvarado. Even though both Scarlett Fever and Mary Rose have long blonde hair, any similarity of appearance stops there. Scarlett Fever always appears dressed quite provocatively, in a

blouse fastened only by a knot at her waist above skin-tight pants licked with flames. Mary Rose, by comparison, is fully covered, wearing not only a fully buttoned, long-sleeved, white blouse, but also a brown vest, and brown pants.

### (iii) Machete–Serpente

Plaintiffs' claim regarding similarity between LR's Machete and QOS's Serpente is meritless, as it fails to even articulate similarities as to plot, theme, character, or dialogue. The only similarities the Court has found between the two characters in the single comic page submitted by Plaintiffs are that both characters are villains and they both wear two machetes strapped to their back in the shape of an "X." In fact, it is clear to the Court, based on the comic page submitted by Plaintiffs, that the two characters look nothing alike. Plaintiffs' Machete is large, burly, and bald. Serpente is thin, often wears a hat, but clearly has hair. The Court was not informed of the plot involving Machete. But Plaintiffs do not even hint at any plot similarities between Machete's role and the conflicts and sword-fight between QOS and Serpente, culminating in Dr. Helm's killing of Serpente to save QOS. The fact that both characters wear crossed machetes on their backs is clearly not enough for the Court to find substantial similarity.

### (2) Theme

### (a) MOZ and QOS

Plaintiffs characterize the theme of both MOZ and QOS as "overcoming the desire for personal revenge and instead opposing evil by assisting the poor and disadvantaged." (Curtis Decl. ¶ 21(f).) Defendants differentiate between MOZ and QOS on the ground that Banderas Zorro begins his training so that he can get his revenge, while the QOS merely thwarts her adversaries' plans.[19] (Opp'n 13.) Assuming

---

19. Defendants point out that the QOS cannot kill her adversaries because they must appear in later episodes. The need to keep villains alive from one episode to the next is one example of the "special difficulty" of comparing a single feature film with a series of

Plaintiffs' characterization of the theme of MOZ and QOS is accurate, the theme "in itself is but an unprotectable idea." *Shaw*, 919 F.2d at 1362 (finding that the plaintiff's characterization of theme involving the Equalizer can be attributed to characters from Aladdin to Zorro). Plaintiffs point to no further evidence of thematic similarity between MOZ and QOS. Based on its own viewing of MOZ and episodes of QOS, the Court has not found further similarities of theme; however, it has found significant differences. First, the QOS alter ego, Tessa Alvarado, remarks on several occasions in the first episode that her role as the QOS is her "destiny." Banderas Zorro makes no claim that being Zorro is his destiny. *Id.* (noting that the lead character in the works at issue each described his role as to "equalize" or "shake up" the odds). Second, it is apparent from the first episodes of QOS that Tessa Alvarado does not know the real circumstances of her father's death, never mind who should be the target of her revenge. Banderas Zorro, on the other hand, makes Harrison Love the target of his revenge early in MOZ because he witnessed his brother's death and knows that Harrison Love was the cause of his death. Given the lack of further evidence of thematic similarity between MOZ and QOS, the Court finds that the similarity of themes in MOZ and QOS does not extend to elements of protectable expression.

### (b) LR and QOS

When comparing LR to QOS, Plaintiffs replace the relatively altruistic theme they previously ascribed to QOS with a very different one, characterized as "violently avenging wrongs done to family members." (McGregor Decl. ¶ 18.) [20] Plaintiffs seem to argue that the QOS seeks revenge for her father's death [21] just as LR seeks revenge for the blindness visited on her brother. This thematic characterization, however, overlooks the important fact that in the LR stories, Zorro is a target of LR's revenge. LR believes, erroneously of course, that Zorro was involved in blinding her brother. Even if the Court overlooks this glaring thematic difference and assumes similarity of themes between QOS and LR, the theme of avenging wrong done to family members remains an unprotectable idea. *Id.* The Court therefore finds that the similarity of themes in LR and QOS does not extend to elements of protectable expression.

### (3) Plot/Sequence of Events

### (a) MOZ and QOS

Plaintiffs argue that the first two episodes of QOS display several plot elements from MOZ in the same sequence as MOZ. The elements include the death of the protagonist's beloved family member at the hands of an expatriate American mercenary, the return of the main female char-

---

television episodes. As the Court indicated at oral argument, it is reluctant to find that a television series can never, as a matter of law, infringe a feature film. *See Morgan Creek Prods. Inc.*, 1991 WL 352619, 22 U.S.P.Q.2d at 1891. At the same time, however, such necessary differences between a feature film and a television series are not wholly insignificant to the Court's application of the extrinsic, objective test.

20. Plaintiffs' arguments regarding themes in QOS are questionable. Plaintiffs argue that QOS has a theme of "overcoming personal

revenge," when compared to MOZ, but has the opposite theme of taking violent personal revenge, when compared to LR.

21. The Court, however, is not convinced that the QOS could really be seeking revenge for her father's death because she was told he died in a horse riding accident. Although she does not accept this explanation as the truth, and she seeks to investigate the facts surrounding his death, she has not learned the truth of how he died in the episodes viewed so far.

acter to Old California from Spain, as well as the protagonist's learning to fight with a sword, donning a black costume and mask to avenge the family member's death, freeing secretly enslaved gold miners, and then blowing-up a gold mine. (Curtis Decl. ¶ 21(b), (g); Pl. Exhs. 32–34, 39–44, 47, 49.)

A comparison of the plots and sequence of events in MOZ and QOS reveals that the works share these elements, but it also reveals that the works are sufficiently different in plot and event sequence such that the Court cannot find the necessary substantial similarity for copyright infringement. For example, in connection with the loved ones' deaths, Tessa Alvarado is told while she is training in Spain that her father died when he fell off a horse. By contrast, Hopkins Zorro is present when his wife is accidentally killed when Don Montero and his minions invade Hopkins Zorro's home. Banderas Zorro is also present when his brother, attempting a robbery, is violently killed. Regarding sword skill, Tessa Alvarado learns to fight with a sword while she is in Spain; Banderas Zorro learns in California from Hopkins Zorro. Also, Tessa Alvarado returns to California after hearing of her father's death while Elena returns to California with her impostor father, Don Montero, and not in response to news of anyone's death. Additionally, Tessa Alvarado creates her own black costume after her father's ghost reveals her "destiny" as the QOS in a dream. Banderas Zorro, on the other hand, first wears a Zorro costume, presumably copied from Hopkins Zorro's costume, to steal a horse. The MOZ plot never reveals when or why Hopkins Zorro learned his swordplay or donned a Zorro costume or persona.

The sequences of events related to the gold mine incidents in MOZ and QOS are also different. In MOZ, Don Montero forced slaves to mine gold in a secret location, "El Dorado," to buy California from the Mexican General Santa Ana. Under the tutelage of Hopkins Zorro, Banderas Zorro gains Montero's trust by pretending he is a Spanish aristocrat, attending Montero's lavish party, and befriending Montero. Montero enlists the dons in his plans to buy California, and he takes them, along with Banderas Zorro, to the mine where he further explains his plan. Montero maintains the secrecy of the mine's location even when he shows it to the dons and Banderas Zorro. Montero ultimately decides that he must blow up the mine and kill the prisoners who worked there to prevent detection of the mine's location. The climax of MOZ occurs when both Banderas Zorro and Hopkins Zorro arrive at the gold mine and fight their respective enemies, Love and Montero, to the death. The gold mine is destroyed by an explosion of the dynamite Montero had previously set. By the time of this climactic scene, Elena has learned that Hopkins Zorro is her real father. In addition, she has fallen in love with Banderas Zorro. She also arrives at the mine, and before it explodes, she shoots the locks off the prison cells and frees the enslaved gold miners.

In QOS, on the other hand, Colonel Montoya enslaves peasants to mine gold that he will use to purchase artillery. The QOS learns that peasants are missing, and she sets out to look for them. While looking for the peasants, the QOS comes very close to the mine and a battle with many soldiers ensues. The QOS's only escape route is to dive off a cliff and into the water below. The QOS, alive but injured, comes ashore on a sandy beach. Despite her injury, she manages to steal a sword-wielding soldier's horse and to retrieve her own sword, fortuitously left nearby in the sandy beach. The QOS rides home, where she changes into a red dress (the better to hide her still-bleeding wound) and then

attends Montoya's party as Tessa Alvarado, lest her absence from the heavily-attended affair arouse any suspicion. She later returns, as QOS, to the area where she battled the soldiers and finds the mine. But when a soldier at the mine threatens to kill a hapless peasant if she does not surrender, she allows herself to be captured and held hostage. Dr. Helm is also at the mine at the behest of Montoya, who has finally recognized that the unchecked illness and deaths of the enslaved peasants is threatening to thwart completion of his plans. Dr. Helm helps QOS escape from the soldiers, but Montoya and his army pursue her. QOS retreats into the mine, takes a hostage, sets up an explosive, and blows up the mine. The explosion creates the diversion she needs to escape and deprives Montoya of the gold needed for his scheme. No one dies during this mine sequence.

■ In addition to the differences the Court has just described in the plot sequences of MOZ and QOS, the Court notes that Plaintiffs, in an attempt to show similarity between MOZ and QOS, rely on various unprotectable elements. As the Court previously explained, "the party claiming infringement may place 'no reliance upon any similarity in expression resulting from' unprotectable elements." *Apple Computer Inc.*, 35 F.3d at 1446. Unprotectable elements, including factual material and *scenes a faire*, must be filtered out of any analysis of substantial similarity. *Scenes a faire* "are incidents, characters, or setting which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Chase–Riboud*, 987 F.Supp. at 1227 (citation omitted). The Court finds that many of the other QOS scenes Plaintiffs argue are similar to MOZ likely constitute *scenes a faire*.[22]

For example, when traveling from Spain to California in the early 19th century, people arrived by ship because there was no other way. Therefore, Tessa Alvarado's arrival by ship in California, which Plaintiffs claim copies Elena's California arrival in MOZ, likely constitutes a *scene a faire*. Additionally, heroes, heroines, and anyone else who wanted to travel other than by foot used or rode horses, many of which were dark, during that time period as well.[23] QOS's riding a dark horse, therefore, is likely an unprotected element. Similarly, parties were a common source of entertainment and diversion during an era without movies or television. Tessa Alvarado/QOS's attendance at Montoya's party, therefore, is not infringing.[24] Moreover, the use of a flag-draped balcony from which a military commander addresses a crowd before a highly anticipated event, such as an execution, is a standard setting for a show set in the early 19th century. The hero or heroine's sudden appearance on the scene to thwart the expected event is, standing alone, not enough to infringe.

22. The Court notes Plaintiffs, in exhibits 44–52, place photos of QOS scenes beside photos of MOZ scenes to show what they believe to be substantial similarity. For the most part, however, the Court finds that these photos show very little similarity between the scenes.

23. Plaintiffs' exhibit 52 purports to show the QOS standing on two galloping horses, like Banderas Zorro did in MOZ. Assuming that she is riding two horses, this stunt is standard in wild west type adventure movies.

24. Additionally, the party scene in MOZ is quite different from the party scene in the first episode of QOS. In the MOZ party scene, it is evening, and Elena dances, at first demurely, and then in a sensuous tango with Banderas Zorro. The QOS party scene in the first episode, however, is during the day, and Tessa Alvarado dances only cordially with Montoya, and for the dual purposes of greeting him and asking him to spare the life of the prisoner who is tied-up outside. In the party scene in the second episode, Tessa Alvarado dances with no one.

Finally, many heroes and heroines, including Fairbanks's Zorro in "The Mark of Zorro," have a secret lair to aid in their transformation from an ordinary person into a hero. Tessa Alvarado's use of her father's wine cellar in connection with her transformation into the QOS, therefore, is also likely not infringing. Finally, flattering camera angles of a hero or heroine, on a horse or alone, whether back-lit or not, are indispensable to hero or heroine-driven action adventure stories.[25]

### (b) LR and QOS

The only event in QOS that Plaintiffs point to as infringing LR occurs when QOS jumps off the cliff, following her discovery of Montoya's soldiers near the gold mine, and survives. Plaintiffs point to a comic wherein LR and her horse jump off a cliff and survive. (Pl.Exh. 58.) The Court notes, however, that jumping off a cliff to escape a foe and miraculously surviving, with nothing more, is an unprotectable idea. Plaintiffs have shown no further similarity related to the plot of LR and QOS; therefore, the Court finds that Plaintiffs have not come close to showing the substantial similarity of plot necessary for infringement.[26]

### (4) Mood, Setting, and Pace

### (a) MOZ and QOS

Plaintiffs allege that MOZ and QOS attempt to strike a classic action adventure tone sprinkled with humor. (Curtis Decl. ¶¶ 21(d), (e).) Defendants point out that QOS incorporates supernatural, mystical elements such as ghosts and gypsy fortune-telling. (Opp'n 13.) The Court acknowledges this difference, but finds that the moods of MOZ and QOS are necessarily similar given their action adventure genre. A relatively rapid pace, which MOZ and QOS also share, is also necessary to an action adventure movie or television series. Because the mood and pace in MOZ and QOS are common to any action adventure movie or series, these factors do not weigh heavily in the Court's decision. *Shaw,* 919 F.2d at 1363.

In terms of setting, MOZ and QOS are both set in Old California. MOZ opens in Old California in 1821. Although QOS opens in Madrid in 1817, the story quickly moves to Old California. Notably, however, the settings of MOZ and QOS are both quite similar to McCulley's setting in "Curse of Capistrano," which is no longer protected by copyright. This element, therefore, also does not weigh heavily in the Court's decision.

### (b) LR and QOS

Plaintiffs do not attempt to equate the mood and pace of LR and QOS. They merely point out that QOS and LR are set in the "same mythical, early 19th century, old California setting of the Zorro milieu." (Mtn.15.) As the Court has just explained, McCulley's setting in "The Curse of Capistrano" is not protected. Furthermore, even if the Court found substantial similarity between LR and QOS in terms of mood or pace, it would be because it considered both works to be action adventure. The similarity, therefore, would again not weigh heavily in the Court's decision.

---

**25.** The Court notes that Plaintiffs also argue QOS uses music similar to that used in MOZ. Plaintiffs do not, however, allege that QOS copied any music; therefore, the Court is unclear how QOS's use of music could be infringing.

**26.** The Court notes that Plaintiffs argue, "[b]oth QOS and LR involve young, female Spanish aristocrats who decide to avenge the injury/death of a family member injured by a military assistant to a Spanish military ruler." (Mtn.15.) This "plot summary," however, appears to be a restatement of Plaintiffs' theme. The Court, on its own inquiry, has not found a substantial similarity of plot between LR and QOS.

## b. Subjective, Intrinsic Test Applied

"The second step of the *Krofft* analysis requires the trier of fact to decide whether there is substantial similarity in the expression of the ideas so as to constitute copyright infringement." *Shaw*, 919 F.2d at 1358. After viewing MOZ and many episodes of QOS, the Court does not find that QOS captures the total concept and feel of MOZ. Indeed, the Court finds the works to be quite different overall. QOS is a low-budget, family-friendly adventure series set in a much smaller milieu than MOZ. It does not appear to be tailored to the tastes of the sophisticated viewer. Because it is a television series and episodic by nature, it frequently features a guest star in each episode. MOZ, on the other hand, is a large-scale film that seeks to revise the legend of Zorro and bring it to life through a story in which a mature and aristocratic Zorro passes his sword to a successor Zorro of humble origins, who not only triumphs over evil, but also wins a beautiful wife and riches in the process.

 Although the Court cannot deny an injunction based solely on dissimilar elements,[27] the Court notes at least three important QOS themes that are absent from MOZ: the mystical element represented by Marta and the tarot cards; the friendship between Tessa and Marta; and the mystery surrounding Dr. Helm, followed by his developing love interest with the QOS. The Court also notes QOS's subplots based on the tensions between the villains Montoya and Grisham, and the affairs of Don Hidalgo's high spirited wife, Vera.

## c. Preliminary Injunction Standard Applied

In light of the Court's inability to find substantial similarity between QOS and MOZ or LR, the Court cannot find that Plaintiffs have a high likelihood of success on the merits of their copyright claims.[28] Similarly, the Court is unable to find that Plaintiffs have established the irreparable injury necessary for a preliminary injunction based on copyright infringement. Finally, given the fact that QOS has not been renewed and MOZ has recently been made available for free viewing on network television, the Court is also unable to find that the balance of hardships tips sharply in Plaintiffs' favor at this time.

## B. Unfair Competition

 To succeed on their trademark infringement claims, Plaintiffs must establish that they own valid trademark rights. Unless the mark Plaintiffs seek to protect is so arbitrary, unique, and non-descriptive as to constitute a "technical trademark," Plaintiffs must also establish that the mark has secondary meaning.[29] *Frederick Warne & Co., Inc. v. Book Sales, Inc.*, 481 F.Supp. 1191, 1195 (S.D.N.Y.1979). Secondary meaning is defined as " '[t]he power of a name or other configuration to symbolize a particular business, product or company.' " *Id.* (citations omitted). "Consumers need not identify the producer by name," however. *Morgan Creek Prods. Inc. v. Capital Cities/ABC*, 1991 WL 352619, 22 U.S.P.Q.2d 1881, 1889 (C.D.Cal. 1991.) "Indicia of secondary meaning include advertising expenditures, consumer studies linking the name to a source, sales

---

**27.** " 'No plagiarist can excuse the wrong by showing how much of his work he did not pirate.' " *Shaw*, 919 F.2d at 1362 (citation omitted).

**28.** The Court's inability to make this finding is further justified by the dispute concerning the

validity of Plaintiffs' copyrights in the LR comic books. *See* n. 10, *supra*.

**29.** Plaintiffs concede that they must establish secondary meaning in this case.

success, unsolicited media coverage of the product, attempts to plagiarize the mark, and length and exclusivity of the mark's use." *Id.*

 To claim ownership of a trademark, however, Plaintiffs must first identify the mark they seek to protect. Plaintiffs concede that there is no infringement of an actual mark; however, they argue that Defendants have infringed their *character* Zorro. To that end, Plaintiffs ask the Court, in section (e) of their proposed preliminary injunction, to enjoin and restrain Defendants from:

> imitating, copying, or making any other unauthorized use of any common law trademarks and trade dress associated with the distinctive "key art" advertising for the motion picture "The Mask of Zorro;" and/or all common law trademarks and trade dress in the appearance, skills, secret identity motif, personality traits, personal background, setting, signature "Z" mark, or "rearing horse" mark, or any confusingly similar combination of some of those distinctive elements[.]

Because this description is relatively vague, the Court asked Plaintiffs at oral argument to clarify exactly what Plaintiffs claim as their trademark or trade dress rights in the character Zorro.[30] Plaintiffs attempted to clarify their claim; however, it remains unclear to the Court how Plaintiffs have trademark or trade dress rights in the character Zorro such that Defendants' series QOS could be infringing.

Plaintiffs argue that they have a common law trademark in the character Zorro because their licensees have used Zorro extensively for decades. Plaintiffs argue that these licensed uses inure to their benefit and cause consumers to think of Zorro when they see a daring black-masked and costumed character with a sword, superior fighting and riding skills, and a dual identity. Plaintiffs argue that other factors, including the use of a secret lair and a mythical Old California setting also help to evoke Zorro in consumers' minds.

Plaintiffs' argument that they have a trademark in Zorro because they licensed others to use Zorro, however, is specious. It assumes that ZPI had the right to demand licenses to use Zorro at all.[31] The case Plaintiffs cite, *General Motors Corp. v. Gibson Chemical & Oil Corp.*, does not resolve this leap of logic. 786 F.2d 105, 110 (2d Cir.1986) (addressing whether the district court abused its discretion in granting a preliminary injunction where General Motors had licensed its mark under a controlled program and had not abandoned the mark). Given that Plaintiffs cannot point to a specific mark at issue, and that it is unclear whether Plaintiffs have the right to license the character Zorro, Plaintiffs' trademark claim at this time remains undefined and unfocused.

---

**30.** In its memorandum to the parties at oral argument, the Court noted that Plaintiffs rely on *Frederick Warne & Co., Inc. v. Book Sales Inc.* for the argument that the character Zorro is protectable under trademark law even though works in which the character was created have fallen into the public domain. 481 F.Supp. at 1196–97. In *Warne,* however, the plaintiff sought only to protect its limited right to use specific illustrations of the character Peter Rabbit, not to establish exclusive trademark rights in the character itself. The court therefore noted that it did not need to reach the "provocative question" whether

"trademark and unfair competition theories might serve to protect a character beyond the term of copyright applicable to the underlying work." *Id.* at 1197 & n. 3. This "provocative question" remains unresolved today. *See* Bonnie E. Eskenazi & Walter Mansing, *Mouse House: Trademark Law May Protect Characters With Expired Copyrights,* L.A. Daily Journal, March 19, 2001, at 7.

**31.** The Court notes that since the copyrights in "The Curse of Capistrano" and "The Mark of Zorro" lapsed in 1995 or before, the character Zorro has been in the public domain.

Plaintiffs' argument that Defendants have infringed their trade dress rights is similarly weak. Plaintiffs explained at oral argument that the "key advertising" and other pictures of Zorro connected to the film MOZ form the basis for their trade dress infringement argument. Plaintiffs pointed to MOZ's movie poster advertisement, picturing Zorro in silhouette on a red background, and allege that Defendants copied elements for the QOS picture on the QOS web site. Plaintiffs also pointed to Defendants' use of a rearing horse pose, which they argue is the mirror image of Plaintiffs' rearing horse pose. Additionally, Plaintiffs mentioned Defendants' use of a silhouetted image of the QOS, back-lit with blue light, which Plaintiffs argued is the way they pictured Zorro in MOZ.

As the Supreme Court has explained, "[t]he 'trade dress' of a product is essentially its total image and overall appearance." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Zorro is a character, however, not a product or service whose source gains recognition through its packaging, shape, or design. It is therefore unclear how the purported "trade dress" Plaintiffs described applies to the character Zorro or how it could identify Plaintiffs as Zorro's source. If Plaintiffs argued that the film MOZ, rather than the character Zorro, was the product at issue, the trade dress argument would also likely fail. MOZ (and presumably its posters) is protected by copyright, not trademark. *Shaw*, 919 F.2d at 1364–65 (declining to expand the scope of the Lanham Act to cover cases in which the Federal Copyright Act provides an adequate remedy, at least in the absence of reverse passing off, which Plaintiffs do not allege).

Moving beyond these stumbling blocks, however, and assuming for a moment that Plaintiffs were able to define a trademark and show they owned rights to the character Zorro, Plaintiffs still have the burden of establishing that Zorro has acquired secondary meaning and that the public believes that it derives from a single source. *Morgan Creek Prods.*, 1991 WL 352619, 22 U.S.P.Q.2d at 1886 (addressing secondary meaning and association with a single source); *Universal City Studios, Inc. v. Nintendo Co.*, 578 F.Supp. 911, 923 (S.D.N.Y.1983) (addressing single source); *Warne*, 481 F.Supp. at 1195 (addressing secondary meaning). The Court, however, is unable to find that Plaintiffs have presented sufficient evidence of secondary meaning in the character Zorro.[32]

---

**32.** Plaintiffs filed the declaration of Henry D. Ostberg, Ph.D. ("Ostberg"), their expert witness who conducted a survey to determine whether QOS "brought to mind the Zorro fictional character and the extent (if at all) to which the [QOS] television series was believed to have been produced or licensed by the same producers as the Zorro motion picture and/or television series." (Ostberg Decl. ¶ 9.) Plaintiffs also filed a copy of Ostberg's Survey. (Exh. 70, "Survey to Determine Consumer Reactions to the Queen of Swords Program" ("Survey.")) Defendants objected to Ostberg's declaration and the Survey based on hearsay, failure to authenticate, and lack of reliability. (Defendants' Objections 33.) Defendants also submitted the declaration of their expert, David W. Stewart, Ph.D. ("Stewart"), wherein he concluded that Plaintiffs'

"survey is fatally flawed and should be given no weight because it does not meet even the most minimal requirements of a valid survey." (Stewart Decl. ¶ 8.)

At oral argument Defendants informed the Court that Plaintiffs had refused to produce the videotape used to conduct the Survey. Plaintiffs confirmed their refusal to produce it, and they offered the Court no explanation for their refusal. Because Plaintiffs have not provided the videotape at issue in the Survey, thus depriving Defendants of another basis upon which to meaningfully oppose it, the Court in its discretion declines to consider the Survey. If the Court had considered the Survey, however, the Court would have been inclined to give it very little weight in light of

Because Plaintiffs have not sufficiently defined their trademark rights to the character Zorro, the Court cannot assess whether there is a likelihood of confusion under *Sleekcraft*. As a result, the Court cannot find that Plaintiffs have established the irreparable injury necessary for a preliminary injunction based on trademark infringement. Similarly, for reasons the Court has already explained, it is unable to find that Plaintiffs have a likelihood of success on the merits of their trademark claims. Finally, given the fact that QOS has not been renewed and MOZ has recently been made available for free viewing on network television, the Court is also unable to find that the balance of hardships tips sharply in Plaintiffs' favor at this time.

## IV. CONCLUSION

For the reasons explained herein, the Court hereby DENIES Plaintiffs' Motion for a Preliminary Injunction.

**SO ORDERED.**

Stewart's critique, which the Court found persuasive.